IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
_____

ALEX GERSKOVICH,

                            PLAINTIFF,

      vs.

NYPD CAPTAIN MARK IOCCO,
THE CITY OF NEW YORK, a municipal entity,
MICHAEL BLOOMBERG, RAY KELLY
FORMER NYPD CHIEF OF PATROL JOSEPH
ESPOSITO, NYPD ASSISTANT CHIEF THOMAS
P. PURTELL, NYPD DEPUTY CHIEF STEVEN
ANGER, NYPD DEPUTY CHIEF JAMES
MCNAMARA, ARRESTING OFFICER
SHIELD NO. 719, ARRESTING OFFICER
SHIELD NO. 10074, ARRESTING OFFICER
SHIELD NO. 2635, JOHN DOE ARRESTING
OFFICER AFRICAN-AMERICAN SERGEANT,
DEFENDANTS "PRE-ARRAIGNMENT"
JOHN-DOE OFFICERS and JOHN DOE
OFFICERS 1-10.

                        DEFENDANTS.

_____

Index No.
ECF CASE

COMPLAINT
[JURY TRIAL
DEMANDED]

      Plaintiff ALEX GERSKOVICH, by his attorneys, STECKLOW & THOMPSON,

complaining of the defendants, respectfully alleges as follows:

## I.    PRELIMINARY STATEMENT

      1.      Plaintiff ALEX GERSKOVICH brings this action for compensatory

damages, punitive damages and attorney's fees pursuant to 42 U.S.C. § 1983 and 42

U.S.C. § 1988 for violations of his civil rights, as said rights are secured by said statutes

and the Constitutions of the State of New York and the United States.

2.      On the morning of September 17, 2012, the Plaintiff ALEX GERSKOVICH went to downtown Manhattan to participate in expressive speech activity to celebrate and document the one-year anniversary of Occupy Wall Street.  While he was standing outside a commercial building on Water Street, the NYPD were inside the commercial building, breaking up expressive speech activity that was taking place in the building lobby.  Plaintiff ALEX GERSKOVICH began to photograph both the police and the individual protesters exiting the building.  Without cause, Defendant Captain Mark Iocco and other defendants stopped and detained the plaintiff, demanding that he produce a press pass. Plaintiff had no press pass.  Defendant Captain Mark Iocco and others then aggressively grabbed Plaintiff, shoved his body and face against a brick wall, and unlawfully placed him under arrest.

3.      Defendant CAPTAIN MARK IOCCO falsely swore in a criminal complaint that he observed Plaintiff inside the building lobby with thirty (30) other individuals.

4.      Plaintiff was detained in the back of a police transport vehicle, driven to the precinct, and moved into a holding cell and held for more than sixty (60) hours by the NYPD before being arraigned.

## II. JURISDICTION

5.      This action is brought pursuant to 42 U.S.C. §§ 1983 and 1988, and the First, Fourth and Fourteenth Amendments to the United States Constitution. Jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1331, 1343(a)(3) and (a)(4) and the aforementioned statutory and constitutional provisions.

6.      Plaintiff ALEX GERSKOVICH further invokes this Court's supplemental jurisdiction, pursuant to 28 U.S.C. § 1367, over any and all State law claims and causes

of action which derive from the same nucleus of operative facts and are part of the same case or controversy that gives rise to the federally based claims and causes of action.

### III.  VENUE

7.      Venue is proper for the United States District Court for the Southern District of New York, pursuant to 28 U.S.C. § 1391(a), (b), and (c) and § 1402(b) because the claims arose in this district.

### IV. JURY DEMAND

8.      Plaintiff ALEX GERSKOVICH respectfully demands a trial by jury of all issues in this matter pursuant to Fed. R. Civ. P. 38(b).

### V. THE PARTIES

9.      Plaintiff ALEX GERSKOVICH ("the Plaintiff") is a resident of the State, City and County of New York, who was lawfully present on the sidewalk in downtown New York City on September 17, 2012 and participating in expressive speech activity related to the First Anniversary of Occupy Wall Street when he was arrested and charged with two counts of trespass and one count of disorderly conduct. Mr. Gerskovich was detained for more than sixty (60) hours in connection with this arrest.

10.      Defendant THE CITY OF NEW YORK was and is a municipal corporation duly organized and existing under and by virtue of the laws of the State of New York.

11.      Defendant THE CITY OF NEW YORK maintains the New York City Police Department, a duly authorized public authority and/or police department, authorized to perform all functions of a police department as per the applicable sections of the New York State Criminal Procedure Law, acting under the direction and supervision of the aforementioned municipal corporation, THE CITY OF NEW YORK.

12.     Defendant Michael Bloomberg, at all relevant times herein, was the Mayor of the City of New York and took a direct interest in overseeing the policing of Occupy Wall Street.  At all times relevant to the conduct of the NYPD, he was responsible for the policy, practice, supervision, implementation, and conduct of all NYPD matters and responsible for the appointment, training, supervision, and conduct of the highest ranking NYPD personnel.  As Mayor of the City of New York, Michael Bloomberg was a policy-maker with respect to the decisions on training and supervision of police officers in relation to Occupy Wall Street and expressive speech activity protected by the First Amendment to the United States Constitution. Michael Bloomberg is sued in his individual and official capacities.

13.     At all times relevant herein, Defendant Former Commissioner Ray Kelly ("Commissioner Kelly") was Commissioner of the NYPD. At all times relevant, he was responsible for the policy, practice, supervision, implementation, and conduct of all NYPD matters and responsible for the appointment, training, supervision, and conduct of all of the NYPD members of service including the highest ranking NYPD personnel. Commissioner Kelly is sued in his individual and official capacities.

14.     At all times relevant herein, Defendant Former Chief of Patrol Joseph Esposito ("Chief Esposito") was a duly sworn police officer of the NYPD.  At all times relevant to the conduct of the NYPD, he was the second highest ranking member of the NYPD, responsible for the policy, practice, supervision, implementation, and conduct of virtually all NYPD matters and responsible for the appointment, training, supervision, and conduct of virtually all of the NYPD members of service including the highest ranking NYPD personnel. Chief Esposito is sued in his individual and official capacities.

15.     Defendant New York City Police Chief Thomas P. Purtell ("Chief Purtell") was a duly sworn police officer of the NYPD.  On September 17, 2012, Chief Purtell was the incident commander of the NYPD policing of Occupy Wall Street activities.  Chief Purtell was the borough commander of Manhattan, responsible for the policy, practice, supervision, implementation, and conduct of many NYPD matters and responsible for the appointment, training, supervision, and conduct of many of the NYPD members of service including high ranking NYPD personnel. Chief Purtell is sued in his individual and official capacities.

16.     Defendant New York City Police Deputy Chief Steven Anger ("Chief Anger") was a duly sworn police officer of the NYPD.  On September 17, 2012, Chief Anger was one of two aides to the incident commander of the NYPD policing of Occupy Wall Street activities.   Chief Anger was an assistant to the borough commander of Manhattan, responsible for the policy, practice, supervision, implementation, and conduct of many NYPD matters and responsible for the appointment, training, supervision, and conduct of many of the NYPD members of service including high ranking NYPD personnel.  Chief Anger is sued in his individual and official capacities.

17.     Defendant New York City Police Deputy Chief James McNamara ("Chief McNamara") was a duly sworn police officer of the NYPD.  On September 17, 2012, Chief McNamara was one of two aides to the incident commander of the NYPD policing of Occupy Wall Street activities.   Chief McNamara was responsible for the policy, practice, supervision, implementation, and conduct of many NYPD matters and responsible for the appointment, training, supervision, and conduct of many of the NYPD

members of service including high-ranking NYPD personnel. Chief McNamara is sued in his individual and official capacities.

18.     The Defendants listed in paragraphs 11 – 17 are hereafter collectively referred to as the Monell Defendants.

19.     Defendant NEW YORK POLICE CAPTAIN MARK IOCCO ("CAPTAIN IOCCO") was a duly sworn police officer of said department and was acting under the supervision of said department and according to his official duties. On September 17, 2012, CAPTAIN IOCCO was assigned to Sector 1B and was a supervisor of officers involved in the NYPD policing of Occupy Wall Street activities.

20.     Defendant  "ARRESTING OFFICER SHIELD 719" was a duly sworn police officer of said department and was acting under the supervision of said department and according to his official duties. Defendant "ARRESTING SHIELD 719" held Plaintiff against a wall and applied plastic flexicuffs.

21.     Defendant  "ARRESTING OFFICER SHIELD 10074" was a duly sworn police officer of said department and was acting under the supervision of said department and according to his official duties. Defendant "ARRESTING OFFICER SHIELD 10074" aided in holding Plaintiff against a wall and applying plastic flexicuffs to plaintiff.

22.     Defendant  "ARRESTING OFFICER SHIELD 2635" was a duly sworn police officer of said department and was acting under the supervision of said department and according to his official duties. Defendant "ARRESTING OFFICER SHIELD 2635" aided in maintaining the Plaintiff under the physical control of the other police officers, and assisted these other officers in performing the arrest.

23.     Defendant  "JOHN DOE ARRESTING OFFICER AFRICAN-AMERICAN SERGEANT" was a duly sworn police officer of said department and was acting under the supervision of said department and according to his official duties. Defendant "JOHN DOE ARRESTING OFFICER AFRICAN-AMERICAN SERGEANT" aided in holding Plaintiff against a wall and applying plastic flexicuffs.

24.      DEFENDANTS "PRE-ARRAIGNMENT" JOHN-DOE OFFICERS were duly sworn police officers of said department and were acting under the supervision of said department and according to his official duties.  DEFENDANTS "PRE-ARRAIGNMENT" JOHN-DOE OFFICERS failed to provide Plaintiff with appropriate meals during his post-arrest, pre-arraignment time, and failed to properly move Plaintiff through the system to arraignment in a timely fashion.

25.     All of the individually-named defendants, either personally or through their employees, were acting under color of state law and/or pursuant to official rules, customs and practices of the State or City of New York.

26.     Plaintiff ALEX GERSKOVICH will amend this complaint to identify each of the "John Doe" police officers by their true names, as their identities can be established to a reasonable certainty.

27.     The individual police officers named in paragraphs 19-24, whether identified by their true names or by "John Doe" names, will be collectively referred to as the Defendant POLICE OFFICERS.

28.     Each and all of the acts of the defendants, other than the City of New York, alleged herein were done by said defendants while acting within the scope and in furtherance of their employment by Defendant THE CITY OF NEW YORK.

VI. FACTS COMMON TO ALL CLAIMS

OCCUPY WALL STREET

29.     The Plaintiff, Alex Gerskovich, was a participant in the Occupy Wall

Street ("OWS") movement.

30.     OWS, among other things, protests the institutionalized inequality that

funnels political power, wealth, and resources to a tiny fraction of people and their

corporations, and denies the vast majority of ordinary Americans and people their fair

share.  In particular, OWS sought, and seeks, to bring attention to the unfair way in which

ordinary people are allowed to suffer terrible hardship due to mortgage debt, student loan

debt, or lack of affordable healthcare, as politicians and businessmen blame these people

for "irresponsibility," while huge banks were rescued from any consequences of their

own decision-making and actions by government bailouts funded by those same ordinary

people's taxes.

31.     On September 17, 2011, the first OWS march occurred in the Financial

District of Manhattan and the protesters were blocked from entering the Wall Street area

by the NYPD, who had set up narrow choke points of ingress and egress.  The protesters

found their way to Zuccotti Park and remained there for almost two months effectuating

their political speech goals of drawing attention and raising awareness to the many issues

of inequity.

32.     During this period, the NYPD continually arrested members of OWS for

peaceful protest activity.  For example, on September 19, 2011, individuals associated

with OWS marched from Zuccotti Park to the financial center area and back to Zuccotti

Park.   During this march, NYPD Inspector Edward Winski reached across a police

barricade and tried to drag an individual over the barricade.  The New York Times wrote about this arrest and the police statements regarding the conduct underlying this arrest:

> Another man was arrested, and the police initially said he was charged with jumping a police barrier and resisting arrest. But a reporter and a photographer for the [NY T]imes who witnessed and documented the episode between the man in the orange hat and the police did not see him attempting to jump a barrier. Late in the afternoon, the police said the man was charged with committing disorderly conduct by impeding pedestrian traffic, not with jumping a barrier.

33.     The following day, September 20, 2011, a slightly rainy morning, Inspector Edward Winski, along with other officers, entered Zuccotti Park and unlawfully ordered the OWS media team to remove protective tarps from its computers and video-gear.

34.     Approximately three (3) individuals were arrested on that date, and sued Inspector Edward Winski and the City of New York, for the unlawful arrests.

35.     Initially, Inspector Edward Winski reported that the tarps had been hanging from trees and this allegation was part of the criminal complaint.  However, after the District Attorney of New York was alerted to video of the incident, a superseding complaint was filed removing the allegation that the tarps were tied to trees.

36.     Upon information and belief, Inspector Winski was not disciplined in any manner for his conduct of September 19 or 20, 2011 or for the misreporting of the facts in the initial criminal complaint.  Instead, Winski was promoted from Deputy Inspector to Inspector in November 2013.

37.     Over the course of the following year, numerous similar altercations occurred between the police and OWS, many resulting lawsuits for improper arrests and

the improper actions of the police towards protesters, including, among other things, pepper spraying individuals engaged in expressive speech activities.[1]

38.     Despite the numerous altercations and resulting arrests, most of the arrests culminated in dismissals, ACD's, or declined prosecutions.  For example, on October 14, 2011 the City of New York sought to physically remove Occupy Wall Street from Zuccotti Park.  Hundreds of people flocked to the park to defend it from this physical eviction.  After an announcement that the NYPD would stand down and that the park would not be cleared, fifteen (15) individuals were arrested but the arrests ultimately resulted in twelve (12) dismissals, ACD's, or declined prosecutions.

39.     The NYPD crowd control protocols employed were similarly ineffective and indicative of the poorly tailored policies and procedures employed by the NYPD to handle the peaceful protests of OWS.  For example, on November 5, 2011, the success of an Occupy supported program, Bank Transfer Day - to have individuals move their savings from institutional banks to community banks - was celebrated with a march from Zuccotti Park to Foley Square.  The New York Times wrote about the incident that occurred once the marchers reached Foley Square:

> Hundreds of Occupy Wall Street demonstrators streamed
> into a desolate part of Foley Square on Saturday afternoon,
> but their slow-moving march turned chaotic as a phalanx of
> police officers issued orders to vacate the sidewalks — and

---

[1]Joseph Ax, *NY City To Pay $330,000 To Settle Pepper-Spray Occupy Lawsuits,* Reuters, http://www.reuters.com/article/2015/07/06/us-usa-occupy-lawsuitidUSKCN0PG2GK20150706; *see also Laugier v. The City of New York, et al.,* *v*13CV6171 (JMF)(settling lawsuit stemming from OWS protest at Brooklyn Bridge); *Appel v. The City of New York, et al.*, 14CV7992 (KPF)(lawsuit from OWS protest at Foley Square); *Global Revolution TV v. City of New York, et al.*, 12CV5086(GBD)(lawsuit related to property damage from police activity); *Occupy Wall Street, et al. v. City of New York*, 12CV4129(GBD)(same).

then swept in to force the issue…. As the confrontation continued, the police kept yelling orders that the sidewalk was closed, or temporarily closed, or had to be closed to keep order. They fanned out in a line, stretching orange mesh netting across the breadth of the sidewalk, and walked along, pushing protesters back and sweeping them away.

The strategy drew expressions of puzzlement from many in the area.

"The police warned these people to move because of pedestrian traffic, but this is an empty place," said Robert Rosen, 66. "Who are they talking about?"[2]

40.     There were twenty-one (21) arrests on this date that resulted in fifteen (15) dismissals, ACD's, declined prosecutions and/or acquittals.

41.     The arbitrary and unreasonable crowd control measures employed by the NYPD were documented and analyzed in a July 25, 2012 report: "Suppressing Protest: Human Rights Violations in the U.S. Response to Occupy Wall Street" (the "Suppressing Protest Report"):[3]

The pervasive NYPD practice of frequently "closing" sidewalks and forcibly moving along peacefully assembled individuals violates the freedoms of expression and assembly. There may be circumstances in which the closure of otherwise public space is a proportionate and necessary measure to achieve a legitimate aim, such as public safety. Dispersal and closure may be appropriate where, for example, a protest has taken on a violent character, and the closure is needed to restore public order. But mere assembly on public sidewalks is not just cause to move protesters on, or to "close" a sidewalk. If protesters are in fact actually "blocking" pedestrian traffic, whether intentionally or inadvertently, police should facilitate assembly rights by informing protesters that they are free to protest on sidewalks, and should assist protesters to ensure

---

[2] Al Baker, *Police Force Wall Street Protesters Off Sidewalks*, NY TIMES, http://cityroom.blogs.nytimes.com/2011/11/05/police-force-wall-street-protesters-off-sidewalks/.

[3] Suppressing Protest Report at 118.

that building entrances are not blocked and that others may pass.

The NYPD's frequent practice of "closing" sidewalks during protests also appears to violate U.S. constitutional law, which protects First Amendment activity on public sidewalks. The U.S. Supreme Court has held that:

[W]hen the use of its public streets and sidewalks is involved….a [government] may not empower its….officials to roam essentially at will, dispensing or withholding permission to speak, assemble, picket, or parade according to their own opinions regarding the potential effect of the activity in question on the "welfare," "decency," or "morals" of the community.

Many areas of New York City are heavily congested with pedestrian traffic, and the difference in treatment between congested resident or tourist pedestrian traffic and protester pedestrian traffic is at times stark. Lawyers described the police enforcement against protesters of the disorderly conduct statute for blocking pedestrian traffic as a tactic to "stifle political protest" that, when combined with physical force, created "a climate of fear."

42.     The Suppressing Protest Report was publicly released on July 25, 2012.

43.     The large majority of Occupy Wall Street related arrests during the first year in New York City were for offenses such as disorderly conduct—a non-criminal violation akin to jaywalking.

44.     Indeed, Defendant Mayor Michael Bloomberg recognized that, "the majority of the protesters have been peaceful and responsible."[4]

45.     Yet, the majority of the protestors who were arrested were taken into police custody, whether for hours or for days, rather than simply being given a summons.

---

[4] Michael Bloomberg, *Michael Bloomberg's Statement on the Zuccotti Park Clearance*, GUARDIAN (Nov. 15, 2011, 8:39 EST), http://www.guardian.co.uk/world/2011/nov/15/michael-bloomberg-statement-zuccotti-park.

46.     Furthermore, between September 17, 2011 and September 17, 2012 – in Manhattan alone – 2,644 members of OWS were arrested.

47.     Only 409 of these arrests resulted in a plea or conviction for any charge.

48.     That is a conversion rate of just over 15% for the thousands of Occupy Wall Street related arrests during the one-year period.

49.     The remainder of the arrests, the overwhelmingly vast majority, were dismissed.

50.     As the dismissal record of the cases against OWS protestors shows, the majority of the people arrested had not done anything wrong.

51.     Indeed, further proof of the improper policing of members of Occupy Wall Street can be seen by the voluminous litigation that has arisen related to the improper policing of the constitutionally protected expressive speech activity.

52.     Since 2011, more than eighty (80) separate litigations have been filed in the Southern District of New York alone.

53.     Approximately fifty (50) of these litigations have been settled at a cost in excess of $1,500,000 dollars, not including the defense costs associated with these matters.

54.     Seventeen (17) of these litigations were filed before September 15, 2012, and the First Anniversary of OWS.

**DELIBERATE INDIFFERENCE AND FAILURE TO PROPERLY TRAIN**

55.     By July or August 2012, Defendant City of New York knew or should have known that members of its police force would encounter individuals engaged in expressive speech activity, especially after months of continued protests, news stories,

and multiple lawsuits alleging unlawful arrests.  Even so, the City of New York, Commissioner Kelly, Mayor Bloomberg, and the other Monell Defendants failed to provide adequate training to NYPD police officers in the handling of protesters exercising First Amendment rights.

56.    For example, Inspector Winski testified in a deposition about the training he has received since becoming a member of the NYPD, including Sergeant training, Lieutenant training, Captain training, Inspector training, lead training, baton training, pepper spray training, and mass formation training, but Inspector Winski could not recall any training pertaining to an individual's constitutional rights and appropriate policing of First Amendment activity.  Nor did Winski recall any training on the First Amendment or its effect on protestor activities prior to the First Anniversary of Occupy Wall Street.

57.    Inspector Winski, however, testified that he believed that the fact that individuals are engaged in First Amendment-protected activity has no effect on the manner with which Penal Law 240 (disorderly conduct) is charged against them, in contravention of established legal precedent.

***The Principles of Proper Policing of Expressive Speech Activity***

58.    Such training should have consisted of clearly established guidelines for police conduct in expressive speech protest situations, including but not limited to these well established legal rights and principles:

> ♦ Under New York State and federal law, a person cannot be arrested for disorderly conduct for the "mere inconveniencing of pedestrians."

♦ Under New York State and federal law, even if protestors block the entire sidewalk, causing pedestrians to step into the street, such conduct is not enough to justify arrest for disorderly conduct.

♦ Under federal law, when a person is engaged in political or expressive speech activity, the First Amendment of the Constitution requires that the government, including the police, give fair warning to protestors that they must disperse before arresting them.

♦ Under New York State law, if a person's conduct does not cause, or recklessly threaten to cause, a substantial impact on the public at large, such as a breach of the peace, then there is no probable cause for an arrest for disorderly conduct.

♦ Under New York State and federal law, a person may only be subject to arrest if there is individualized probable cause to believe that the particular individual arrested committed an offense. Further, probable cause to make an arrest does not arise merely because of a person's presence within a group of people, even if some people in that group are committing offenses.

♦ Under New York State and federal law, the police may not disperse a protest without having a lawful reason to do so.

♦ Under New York State and federal law, a civilian breaks no law by refusing to obey an unlawful order to disperse.

♦ Under New York State and federal law, a civilian cannot be arrested for obstructing governmental administration, for refusing to obey an unlawful order to disperse.

♦ Under federal law and the First Amendment, it is unlawful to arrest a protestor for disorderly conduct unless the protestor is creating a "clear and present danger" of breach of the peace.

♦ Under federal law and the First Amendment, where the municipality and/or the police seek to regulate the time, place or manner of public protest, protestors must be provided an adequate forum for their expression.

59.     Proper training in these clearly-established principles of lawful police conduct would have prevented unlawful arrests of OWS protestors on September 15-17, 2012.

60.     Furthermore, Inspector Winski, like many NYPD officers, underwent extensive training as he progressed through the ranks of the NYPD and did not receive any additional training on these issues.  Like most NYPD officers, Inspector Winski's training on these issues only occurred during the brief six-month period spent at the Police Academy, without any subsequent trainings on these issues.[5]

***The Monell Defendants Knew or Should Have Known That Police Officer Training Was Insufficient Yet Was Needed For the OWS Protests***

61.     Even before the Occupy Wall Street movement, from the NYPD's failure to properly protest the large protests surround the Republican National Convention that cost the City of New York in excess of thirty million dollars, the Monell Defendants understood their officers needed training in policing expressive speech activity.[6]

_____

[5] Numerous other members of the NYPD have testified in depositions that they received no First Amendment training after leaving the Police Academy.
[6] The City paid approximately $18 million dollars in damages and fees to plaintiffs, and spent $16 million defending the lawsuits to outside counsel and the NYC Law Department. http://www.reuters.com/article/2014/01/15/us-usa-newyork-rnc-settlement-idUSBREA0E1S120140115.

62.     In anticipation of Occupy Wall Street, the Monell Defendants did conduct large-scale training for the NYPD in August 2011 on Randall's Island.

63.     This training did not address First Amendment issues or how this changed the policing methods.

64.     Instead, this training included policing and formations to be used to splinter and control mass protest.   This training included non-verbal commands for disorder control formations such as that holding both arms flat out to each side indicates line formation; and holding both arms extended in a circle above your head is encirclement formation.

65.     Importantly, and unfortunately for the innumerable protesters whose rights were violated, the August 2011 training did not include any training about proper policing of expressive speech activity protected by the First Amendment.

66.     Nor did the August 2011 training include training in the proper standards for arrest related to disorderly conduct when expressive speech activity was involved.

67.     Furthermore, the inadequacy of the training was continually highlighted over the following year by the extensive arrests, the exceptional dismissal rate, and the resulting lawsuits.

68.     Additionally, the Suppressing Protest Report detailed and highlighted the unlawful policies and arrests.[7]

69.     Upon information and belief, the Monell Defendants did not make use of the Suppressing Protest Report to assess the adequacy of the NYPD's policies and practices relating to policing protests.

_____

[7] *See Suppressing Protest* at Appx. II.

70.    By September 2012, the City of New York was aware that a large amount expressive speech activity would occur within the confines of the First Precinct, and due to this actual knowledge the NYPD prepared the PBMS Detail #FY13-2809.

71.    The Monell Defendants knew or should have known that in September 2012 members of the NYPD would encounter individuals engaged in expressive speech activity, especially after the two-month occupation of Zuccotti Park and the continual protests arising from the Occupy Wall Street Movement.

72.    The Monell Defendants knew or should have known that in September 2012 members of the NYPD would encounter individuals engaged in expressive speech activity within the confines of the First Precinct.

73.    Yet, the Monell Defendants failed to train the individual street level police officers on the proper treatment of individuals engaged in expressive speech activity.

74.    The Monell Defendants showed deliberate indifference to the rights of members of Occupy Wall Street by failing to properly train the police officers of the First Precinct.

75.    The Monell Defendants showed deliberate indifference to the rights of members of Occupy Wall Street by failing to properly supervise the officers who were assigned to police Occupy Wall Street.

76.    The Monell Defendants, showed deliberate indifference to the unlawful implementation of the policies and practices of the NYPD and failed to properly train the NYPD officers in relation to how the exercise of expressive speech affects the policing of protests, including, among other things, the policing for the offense of disorderly conduct.

77.     Instead of taking necessary steps to curb the number of unlawful arrests of OWS protestors during the year leading up to the Plaintiffs' arrests, the NYPD made no policy changes, even though the vast majority of the 2,644 arrests resulted in a form of dismissal.

78.     Further, the Monell Defendants made no effort to find out why so many OWS arrests were not prosecuted by the District Attorney's office, or why so many arrests were dismissed.  Nor did the Monell Defendants consider changing the policies or procedures as a result of the dismissal rate.

79.     The Monell Defendants never corrected the implemented policies by training, and never conducted training to prevent or address the problematic policies, and instead in an exhibition of deliberate indifference and/or deliberate disregard allowed the activity to continue.

80.     Almost all of the NYPD police officers had only a cursory training on these issues during the brief (six months) time spent in the police academy.

81.     OWS protests were policed not merely by patrol officers, but by high-ranking officers such as Chief of Department Esposito, and Chiefs Purtell, McNamara and Anger (the "CHIEF DEFENDANTS"), among others.

82.     These high-ranking officers had the ability to see that NYPD officers were incorrectly understanding and applying the law.

83.     These high ranking officers had the ability and the duty to set policies that would prevent NYPD officers from making unlawful arrests because of a failure to understand the law.

84.     These high ranking officers had the ability and the duty to ensure that NYPD officers had training that would prevent the officers from making unlawful arrests because of a failure to understand the law.

### Police Officers in Charge of the Arrests

85.     On September 15-17, 2012, Defendant Police Assistant Chief Thomas Purtell was the member of the NYPD who was the highest uniformed ranking police supervisor assuming command.

86.     Chief of Department Joseph Esposito was the second in command to Commissioner Ray Kelly, having command over Patrol Services Bureau, Patrol Borough Manhattan South, Assistant Chief Thomas Purtell, and the officers detailed to the OWS anniversary on September 15-17, 2012.

87.     Moreover, in 2011 and 2012, the Chief Defendants were employees of the NYPD had substantial policy discretion in making and enforcing NYPD policy.

88.     In 2011 and 2012, Chief of Department Esposito identified by the NYPD as having "substantial policy discretion" by the NYPD.

89.     In 2011 and 2012, Chief Purtell identified by the NYPD as having "substantial policy discretion" by the NYPD.

90.     As the Incident Commander of the Occupy Wall Street event on September 17, 2012, Assistant Chief Purtell was responsible for the overall management of the policing activities concerning the event.

91.     As described within Section 213-11 of the NYPD Patrol Guide, *Policing Special Events/Crowd Control,* as the Incident Commander of the Occupy Wall Street event on September 17, 2012, Assistant Chief Purtell was responsible for the command,

control and coordination of all incident operations, including the supervision of all police officers there that day.

92.     In anticipation of the expected expressive speech activity to occur in downtown Manhattan in the days leading up to and on the day of the anniversary of the first march of Occupy Wall Street, Assistant Chief Purtell, along with his two aides, Chiefs Anger and McNamara, prepared a Patrol Borough Manhattan South Detail, that set out which supervising officers would be working on September 17, 2012, and the location and basic duties of their tour for the day.

93.     The majority of the NYPD officers detailed to the First Anniversary of Occupy Wall Street were members of, and supervised by, the Patrol Services Division; in particular, Patrol Borough Manhattan South, which was under the command of Chief Purtell.

94.     On September 17, 2012 alone, there were more than 1,300 police officers from the Patrol Services Bureau deployed to the immediate area around Wall Street. Further, more than 150 additional officers were deployed to Zuccotti Park and 40 mounted police units were deployed.

95.     Upon information and belief, the Monell Defendants were aware of the fact that large numbers of the police officers assigned to police OWS events were not properly trained, and did not have a proper understanding of the law governing lawful arrests at such events.

96.     Upon information and belief, Defendant Chief Purtell and the Chief Defendants, took no steps to ensure that the officers assigned to the September 17, 2012

OWS anniversary events consisted of officers who were properly trained and had a proper understanding of the law governing lawful arrests at such events.

97.     Upon information and belief, Defendant Chief Purtell and the Chief Defendants, took no steps to ensure that the officers assigned to the September 17, 2012 OWS anniversary events performed their duties on that day with a proper understanding of the law governing lawful arrests at such events.

98.     Throughout the period of time from September 15, 2011 and through September 17, 2012, the Chief Defendants were aware of information that placed them on clear notice that officers under their command were pursuing arrest practices that violated the Constitutional rights of OWS protestors.

99.     Upon information and belief, throughout the period of time from September 15, 2011 and through September 17, 2012, the Chief Defendants did nothing to impose, develop or modify any policies or practices that would prevent further unlawful arrests.

100.     Upon information and belief, the City of New York, Commissioner Kelly, Mayor Bloomberg, and the Chief Defendants did not train officers assigned to OWS events in how to make lawful arrests, and how to avoid unlawful arrests.

101.     Upon information and belief, the City of New York, Commissioner Kelly, Mayor Bloomberg, and the Chief Defendants did not assign officers who had proper training to police such arrests.

### The First Anniversary of OWS

102.     In the run-up to the First Anniversary of OWS, expressive activity increased and on September 15, 2012, twenty-seven (27) individuals were arrested which

resulted in thirteen arrests (13) resolved with a dismissal, ACD, decline to prosecute and/or acquittal.  On September 16, 2012, fifteen (15) individuals were arrested which resulted in eleven (11) of those arrests resolved with a dismissal, ACD, declined prosecution, and/or acquittal.

103.    The September 15, 2012 on the ground events are detailed by the New York Times:

> [On September 15th at 8:30 p.m.], near Thames Street, a commander ordered the crowd to disperse, and a moment later officers pushed into the crowd, knocking down some protesters and arresting some.
>
> The police repeated that maneuver a few minutes later, and then pushed a group of protesters against the side of a building. One man objected, and an officer pulled him from the crowd and arrested him. At least two other arrests followed, with officers appearing to grab some people almost at random.
>
> Across Broadway, a commander announced that protesters could not stand on a stretch of sidewalk. A man yelled that he had the right to be there and the commander chased him for several feet before the man scrambled away.
>
> By 9 p.m., almost all of the remaining protesters left the area as a line of officers advanced toward a group standing on the corner of Liberty Street and Broadway while a captain announced through a megaphone that the group was blocking pedestrian traffic.[8]

104.    On September 17, 2012, thousands of individuals came to New York City to meet downtown and celebrate the First Anniversary of Occupy Wall Street.

---

[8] Colin Moynihan, *Several Arrests at Occupy Wall Street March*, NY TIMES, http://www.nytimes.com/2012/09/16/nyregion/several-arrests-at-occupy-wall-street-march.html.

105.    Nonetheless, the Monell Defendants failed to assign officers to these expressive speech activities who understood the proper policing of constitutionally protected activity.

106.    On September 17, 2012, the First Anniversary of Occupy Wall Street was celebrated around the world, including within the confines of the NYPD's First Precinct. According to records provided by the New York County District Attorney's office, a report, under a notation "Happy Birthday OWS", listed on this date over one-hundred and eighty (180+) individuals arrested in relation to OWS anniversary expressive speech activity (of which 88% were resolved with a decline to prosecute, dismissal, or ACD).

**The Plaintiff's Arrest**

107.    On the morning of September 17, 2012, Plaintiff Alex Gerskovich was involved in expressive speech activity in downtown Manhattan when he was unlawfully detained, physically assaulted and arrested by defendant members of the NYPD.

108.    On the date of his arrest, there was no arrest warrant for Plaintiff, and his arrest was not otherwise authorized.

109.    While the Plaintiff was standing outside a commercial building on Water Street, the NYPD were inside the commercial building, breaking up expressive speech activity that was taking place in the building lobby.

110.    From his vantage point outside the building, the Plaintiff began to photograph both the police and the individual protesters.

111.    Without cause, Defendant Captain Mark Iocco and other defendants stopped and detained the plaintiff, demanding that he produce a press pass.

112.    The Plaintiff had no press pass.  Defendant Captain Mark Iocco and others then aggressively grabbed Plaintiff, shoved his body and face against a brick wall, and unlawfully placed him under arrest.

113.    Later, Defendant CAPTAIN MARK IOCCO falsely swore in a criminal complaint that he observed Plaintiff **inside** the building lobby with thirty (30) other individuals.

114.    In fact, the Plaintiff was **outside** the building.

115.    Plaintiff was detained in the back of a police transport vehicle, driven to the precinct, and moved into a holding cell and held for more than sixty (60) hours by the NYPD before being arraigned.

116.    Upon information and belief, Defendant CAPTAIN MARK IOCCO ordered the arrest of Plaintiff knowing that the Plaintiff did not commit any violation or offense.

117.    Once the Plaintiff's unlawful arrest had begun, Defendant CAPTAIN MARK IOCCO chose not to intervene to prevent the Plaintiff's arrest, despite having the obligation, ability and the opportunity to do so.

118.    Plaintiff's arrest was effectuated by defendants CAPTAIN IOCCO, ARRESTING OFFICER SHIELD NO. 719, ARRESTING OFFICER SHIELD NO. 10074, ARRESTING OFFICER SHIELD NO. 2635, and JOHN DOE ARRESTING OFFICER AFRICAN-AMERICAN SERGEANT.

119.    ARRESTING OFFICER SHIELD NO. 2635, after the false arrest had begun, chose not to intervene to prevent the Plaintiff's arrest, despite having the obligation, ability and the opportunity to do so.

120.    Following Plaintiff' unlawful arrest, the Defendant POLICE OFFICERS transported Plaintiff to One Police Plaza.

121.    There the Defendant POLICE OFFICERS detained Plaintiff for approximately eight (8) hours.

122.    Defendant POLICE OFFICERS then transferred Plaintiff to Central Booking.

123.    There the Defendant POLICE OFFICERS detained Plaintiff for more than 50 hours.

124.    Within those more than 50 hours, Defendants "Pre-Arraignment" John-Doe Officers twice neglected to provide scheduled meals for Plaintiff.

125.    Plaintiff was released from Central Booking on September 19th, 2012, after spending over sixty (60) hours in custody.

126.    On or around May 10, 2013, the New York County District Attorney's office dismissed the charges against Plaintiff.

<u>CHIEF OF DEPARTMENT ESPOSITO, AND CHIEFS PURTELL, MCNAMARA AND ANGER FAILED TO ADEQUATELY SUPERVISE THE OTHER DEFENDANT POLICE OFFICERS</u>

100.    On September 17, 2012, Chief of Department Esposito, and Chiefs Purtell, McNamara and Anger (the "CHIEF DEFENDANTS") were the members of the NYPD who were the highest uniformed ranking police supervisors assuming command.

101.    The CHIEF DEFENDANTS were responsible for the overall management of the policing activities concerning the event, including command of the other Defendant POLICE OFFICERS.

102.    The Monell Defendants failed to properly train the officers of the NYPD

in relation to how the exercise of Constitutional Rights affects the policing of protests, including policing for the offense of disorderly conduct.

103.    The Monell Defendants, failed to train its officers in First Amendment rights.

104.    The Monell Defendants failed to train the NYPD in the proper policing of expressive speech activity protected by the First Amendment to the United States Constitution.

105.    The Monell Defendants failed to supervise officers of the NYPD during the policing of expressive speech activity protected by the First Amendment to the United States Constitution.

106.    The Monell Defendants showed deliberate indifference to the rights of members of Occupy Wall Street by failing to properly train the Commanding Officer of the First Precinct.

107.     The Monell Defendants showed deliberate indifference to the rights of members of Occupy Wall Street by failing to properly supervise the officers who were assigned to police Occupy Wall Street.

108.    The Monell Defendants showed deliberate indifference to the rights of members of Occupy Wall Street by failing to properly train the officers who were assigned to police Occupy Wall Street.

<u>FIRST CLAIM FOR RELIEF</u>

<u>DEPRIVATION OF FEDERAL CIVIL RIGHTS UNDER 42 U.S.C. § 1983</u>

AGAINST THE CITY OF NEW YORK, MICHAEL BLOOMBERG, RAY KELLY,
JOSEPH ESPOSITO, THOMAS PURTELL, STEVEN ANGER,
AND JAMES MCNAMARA

127.    Plaintiffs repeat and re-allege each and every allegation contained in the

above paragraphs with the same force and effect as if fully set forth herein.

128.    At all relevant times herein, Defendants THE CITY OF NEW YORK,

MICHAEL BLOOMBERG, RAY KELLY, JOSEPH ESPOSITO, THOMAS PURTELL,

STEVEN ANGER, AND JAMES MCNAMARA established and/or followed policies,

procedures, customs, and or practices, and those policies were the cause of violation of

the Plaintiff's constitutional rights granted pursuant to 42 U.S.C. § 1983, as well as the

case of *Monell v. New York City Dep't of Social Services*, 436 U.S. 658 (1978), including

those under the First, Fourth, and Fourteenth Amendments.  All of the aforementioned

acts of the Chief Defendants, their agents, servants and employees, were carried out

under the color of state law.

129.    Defendants THE CITY OF NEW YORK, MICHAEL BLOOMBERG,

RAY KELLY, JOSEPH ESPOSITO, THOMAS PURTELL, STEVEN ANGER, AND

JAMES MCNAMARA had a duty to the Plaintiff to make the appropriate choice to (1)

establish, implement and follow policies, procedures, customs, and or practices which

conform to and provide for the protections guaranteed to the Plaintiff under the United

States Constitution, including the First, Fourth, and Fourteenth Amendment; (2) select,

supervise, train, control, and review the activities of all agents, servants, employees, and

police officers in their employ, and (3) refrain from deliberate indifference to the

Constitutional rights of the Plaintiff so as to not cause him the injuries and damages

alleged herein.

130.   Defendants THE CITY OF NEW YORK, MICHAEL BLOOMBERG, RAY KELLY, JOSEPH ESPOSITO, THOMAS PURTELL, STEVEN ANGER, AND JAMES MCNAMARA breached their duties to the Plaintiff by, making the wrong choice when: (1) failing to establish, implement, and follow the correct Constitutional policies, procedures, customs, and/or practices; (2) failing to properly select, supervise, train, control, and review the activities of their agents, servants, employees, and police officers as to their compliance with Constitutional safeguards; (3) permitting their agents, servants, employees, and police officers to engage in the unlawful and unconstitutional conduct alleged herein; and (4) exercising, at a minimum, deliberate indifference towards the Constitutional protections afforded to the Plaintiff by disregarding the numerous lawsuits, statistical evidence, and reports indicating that the policies, procedures, customs, and/or practices were improper and violated the Plaintiff's Constitutional rights.

131.   Defendants THE CITY OF NEW YORK, MICHAEL BLOOMBERG, RAY KELLY, JOSEPH ESPOSITO, THOMAS PURTELL, STEVEN ANGER, AND JAMES MCNAMARA acted under the color of state law, pursuant to the policies, procedures, customs, and/or practices of the Defendant the City of New York and the NYPD.

132.   Defendants THE CITY OF NEW YORK, MICHAEL BLOOMBERG, RAY KELLY, JOSEPH ESPOSITO, THOMAS PURTELL, STEVEN ANGER, AND JAMES MCNAMARA knew, or should have known, that by breaching the aforesaid duties and obligations, it was foreseeable that these choices would and did cause the Plaintiff to be injured and damaged as a result of the constitutionally impermissible conduct undertaken pursuant to the policies, procedures, customs, and/or practices, and

that such decisions occurred in contravention of public policy and their legal duties and obligations to the Plaintiffs.

133.    The decisions, actions, and inactions, of Defendants and their agents are the legal cause of injuries to Plaintiff as alleged herein and, as a result, the Plaintiff has sustained general and special damages, as well as incurring attorneys' fees, costs, and expenses, including those as authorized by 42 U.S.C. § 1988, to an extent and in an amount subject to proof at trial.

SECOND CLAIM FOR RELIEF

DEPRIVATION OF FEDERAL CIVIL RIGHTS UNDER 42 U.S.C. § 1983

AGAINST THE DEFENDANT POLICE OFFICERS

134.    The acts complained of were carried out by the DEFENDANT POLICE OFFICERS in their capacities as police officers, with all of the actual and/or apparent authority attendant thereto.

135.    The acts complained of were carried out by the DEFENDANT POLICE OFFICERS under color of state law, and pursuant to the customs, usages, practices, procedures, and the rules of Defendant THE CITY OF NEW YORK and the New York City Police Department, all under the supervision of ranking officers of said department.

136.    The Defendant POLICE OFFICERS collectively and individually engaged in Constitutionally-violative conduct that constituted a custom, usage, practice, procedure or rule of the respective municipality/authority, which is forbidden by the Constitution of the United States.

137.    As a result of the above constitutionally impermissible conduct, Plaintiff was caused to suffer personal injuries, violation of his civil rights, and loss of liberty.

138.    As a result of the Defendant POLICE OFFICERS' impermissible conduct, the Plaintiff has sustained general and special damages, as well as incurring attorneys' fees, costs, and expenses, including those as authorized by 42 U.S.C. § 1988, to an extent and in an amount subject to proof at trial.

THIRD CLAIM FOR RELIEF

FALSE ARREST

139.    Plaintiff repeats, reiterates, and re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

140.    Plaintiff was arrested by the Defendant POLICE OFFICERS without probable cause, without a warrant, and without the plaintiff's consent.

141.    As a result of the above constitutionally impermissible conduct, Plaintiff was caused to suffer personal injuries, violation of his civil rights, and loss of liberty.

142.    As a result of the Defendant POLICE OFFICERS' impermissible conduct, the Plaintiff has sustained general and special damages, as well as incurring attorneys' fees, costs, and expenses, including those as authorized by 42 U.S.C. § 1988, to an extent and in an amount subject to proof at trial.

FOURTH CLAIM FOR RELIEF

EXCESSIVE FORCE UNDER 42 U.S.C. § 1983

143.    Plaintiff repeats, reiterates, and re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

144.    Plaintiff was subjected to excessive and unjustified force by the Defendant POLICE OFFICERS.

31

145.    As a result of the above constitutionally impermissible conduct, Plaintiff was caused to suffer personal injuries, violation of his civil rights, and loss of liberty.

146.    As a result of the Defendant POLICE OFFICERS' impermissible conduct, the Plaintiff has sustained general and special damages, as well as incurring attorneys' fees, costs, and expenses, including those as authorized by 42 U.S.C. § 1988, to an extent and in an amount subject to proof at trial.

FIFTH CLAIM FOR RELIEF

FAILURE TO INTERVENE

147.    Plaintiff repeats, reiterates and re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

148.    The Defendant POLICE OFFICERS had an affirmative duty to intervene on Plaintiff's behalf to prevent the violation of his constitutional rights.

149.    As alleged above, the Defendant POLICE OFFICERS chose not to intervene on Plaintiff 's behalf to prevent the violation of his constitutional rights despite having had realistic opportunities to do so.

150.    The Defendant POLICE OFFICERS chose not to intervene on Plaintiff 's behalf to prevent the violation of his constitutional rights despite having substantially contributed to the circumstances within which Plaintiff's rights were violated by their affirmative conduct.

151.    As a result of the aforementioned conduct of the Defendant POLICE OFFICERS, Plaintiff's constitutional rights were violated.

152.    As a result of the above constitutionally impermissible conduct, Plaintiff was caused to suffer personal injuries, violation of his civil rights, and loss of liberty.

153.    As a result of the Defendant POLICE OFFICERS' impermissible conduct, the Plaintiff has sustained general and special damages, as well as incurring attorneys' fees, costs, and expenses, including those as authorized by 42 U.S.C. § 1988, to an extent and in an amount subject to proof at trial.

WHEREFORE and in light of the foregoing, it is respectfully requested that the Court assume jurisdiction and:

[a] Invoke pendent party and pendent claim jurisdiction.
[b] Award appropriate compensatory and punitive damages.
[c] Empanel a jury.
[d] Award attorney's fees and costs.
[e] Award such other and further relief as the Court deems to be in the interest of justice.

DATED:        New York, New York
              September 15, 2015

Respectfully submitted,

_____//s//_____
Wylie M. Stecklow
STECKLOW & THOMPSON
ATTORNEYS FOR PLAINTIFF
217 Centre Street, 6th Floor
New York, New York 10013
Phone:        (212) 566-8000
Fax:          (212) 202-4952
Wylie@SCTLAW.NYC