IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
_____

ALEX GERSHKOVICH,

|  |  |
|---|---|
|  | Index#: 15CV7280(RMB)(DF) |
| PLAINTIFF, | ECF CASE |
|  |  |
| vs. | FIRST AMENDED COMPLAINT [JURY TRIAL DEMANDED] |

NYPD CAPTAIN MARK IOCCO,
THE CITY OF NEW YORK, a municipal entity,
FORMER NYPD CHIEF OF PATROL JOSEPH
ESPOSITO, NYPD ASSISTANT CHIEF THOMAS
P. PURTELL, NYPD DEPUTY CHIEF STEVEN
ANGER, NYPD DEPUTY CHIEF JAMES
MCNAMARA, NYPD PO IVAN BAUTISTA,
NYPD PO OFFICER DANIEL CROSS,
NYPD SERGEANT DOE AFRICAN-AMERICAN SERGEANT.
                              DEFENDANTS.
_____

Plaintiff ALEX GERSHKOVICH, by his attorneys, STECKLOW &

THOMPSON, complaining of the defendants, respectfully alleges as follows:

## I.    PRELIMINARY STATEMENT

1.      Plaintiff ALEX GERSHKOVICH brings this action for compensatory

damages, punitive damages and attorney's fees pursuant to 42 U.S.C. § 1983 and 42

U.S.C. § 1988 for violations of his civil rights, as said rights are secured by said statutes

and the Constitutions of the State of New York and the United States.

2.      The Plaintiff ALEX GERSHKOVICH is an activist, live streamer and

photojournalist. On the morning of September 17, 2012, he went to downtown Manhattan

and began to participate in First Amendment activity. This activity included participating

in a few actions in the morning and also documenting with video and photography the

1

expressive speech activity that he was a part of.  The Plaintiff had previously live-streamed numerous events related to Occupy Wall Street ("OWS"), and that day he had intended to participate in more First Amendment actions and live-stream various expressive speech activities associated with the one-year anniversary of Occupy Wall Street throughout the day and evening.

3.       At approximately 9:00am, the defendants unlawfully arrested the Plaintiff while he was standing outside a commercial building at the corner of Water and Broad Street.  The defendants arrested the Plaintiff without a warrant or other justification.  The defendants performed this illegal arrest pursuant to a policy and practice of unlawfully arresting people whom the defendants thought to be associated with OWS, and when individuals videotaped or photographed police, violating the Plaintiff's First Amendment rights under the Constitution.  The defendants detained Plaintiff for an excessive period of time, maliciously abused process against him, created and forwarded false evidence against him, and otherwise injured Plaintiff.

4.       Defendant CAPTAIN MARK IOCCO singled Plaintiff out because the Plaintiff was known to him - on information and belief either from his personal observations or from intelligence gathered by the NVPD, including its Intelligence Division – to be an active participant in the Occupy Wall Street (OWS) movement

5.       Plaintiff, when he was arrested, was in the process of documenting, through photographs, the violation of the constitutional rights of numerous individuals being falsely arrested inside the commercial building on the southeast corner of Water Street and Broad Street.  This building has numerous addresses, including 4 New York Plaza, New York, NY ("4 NYP").

6.      Defendant CAPTAIN MARK IOCCO swore out the Criminal Court Complaint that was lodged against Plaintiff.  The arrest occurred at approximately 9:00am on September 17, 2012, and on September 18, 2012 at 7:15pm, Defendant CAPTAIN MARK IOCCO testified falsely to a member of the New York County District Attorney's Office, in order to continue the false detention of the Plaintiff.

7.      Moreover, Defendant CAPTAIN MARK IOCCO falsely swore, under penalties of perjury, to numerous falsehoods in the Criminal Court Complaint lodged against Plaintiff.

8.      Just one day after this false arrest, Defendant CAPTAIN MARK IOCCO falsely swore in the Criminal Court Complaint that he observed Plaintiff inside the building lobby with thirty (30) other individuals.   Defendant CAPTAIN MARK IOCCO knew the Plaintiff was never inside the building.

9.      Just one day after this false arrest, Defendant CAPTAIN MARK IOCCO falsely swore in the Criminal Court Complaint that he observed Plaintiff inside the building lobby yelling and screaming in loud voices inside the lobby of 4 NYP. Defendant CAPTAIN MARK IOCCO knew the Plaintiff, who was never inside the building, did not yell inside the building.

10.      Just one day after this false arrest, Defendant CAPTAIN MARK IOCCO falsely swore in the Criminal Court Complaint that he observed Jim Klein, director of security at 4 NYP, tell the Plaintiff multiple times in a loud voice within a close distance of the Plaintiff: "YOU MUST LEAVE THE BUILDING OR YOU'LL BE ARRESTED FOR TRESPASSING." Defendant CAPTAIN MARK IOCCO knew this conversation never happened.

11.     Just one day after this false arrest, Defendant CAPTAIN MARK IOCCO falsely swore in the Criminal Court Complaint that he observed the defendant refuse to leave the building and continue to stand inside of it and yell and scream.  Defendant CAPTAIN MARK IOCCO knew the Plaintiff was never inside the building, and never refused to leave it.

12.     Just one day after this false arrest, Defendant CAPTAIN MARK IOCCO falsely swore in the Criminal Court Complaint that he observed defendant create a public disturbance/inconvenience in that it caused people to express alarm.  Defendant CAPTAIN MARK IOCCO knew that the Plaintiff caused no disturbance.

13.     Just one day after this false arrest, Defendant CAPTAIN MARK IOCCO falsely swore in the Criminal Court Complaint that he was informed by Jim Klein that defendant did not have permission or authority to be inside of said building or remaining there when asked to leave by the police. Defendant CAPTAIN MARK IOCCO knew that the Plaintiff never entered or remained in the building.

14.     These allegations in the Criminal Court Complaint are lies.

15.     The truth was:

    A.     Plaintiff was never inside 4 NYP on September 17, 2012.

    B.     Plaintiff was never inside 4 NYP on September 17, 2012, yelling and screaming with thirty people.

    C.     Plaintiff was never inside 4 NYP on September 17, 2012, to hear at close range any announcement made by Jim Klein.

    D.     Plaintiff was never inside 4 NYP on September 17, 2012, creating a public disturbance, inconvenience or causing alarm.

16.     What actually happened, as Defendant CAPTAIN MARK IOCCO knew, was:

A.     Plaintiff was outside 4 NYP.

B.     Plaintiff was outside 4 NYP taking photographs of people outside and of arrests occurring inside.

C.     At no point prior to Plaintiff's arrest, while outside 4 NYP did Jim Klein or any member of the 4 NYP security make any announcement to Plaintiff or any other member of the public present that the area was private property and that individuals were not welcome to be present in that area,

D.     At no point prior to Plaintiff's arrest while outside 4 NYP, did Defendant CAPTAIN MARK IOCCO or any member of the NYPD, make any dispersal announcement at all to Plaintiff or any other member of the public present.

E.     Before the Plaintiff was arrested, a number of people, many associated with OWS, were inside 4 NYP.

F.     The Plaintiff, along with many others, observed from outside the building.

G.     Police began making arrests inside.

H.     The Plaintiff photographed what was happening from his position outside the building.

I.     According to information from 4 NYP, the entire incident occurred inside the building between 8:54am, when "protestors made their way into the lobby" … "followed closely by the NYPD at 8:58am," and by 9:00am, "all was under control."   (D13).

17.     As Plaintiff was photographing the arrests taking place inside 4 NYP, numerous individuals, many associated with Occupy Wall Street, were exiting through the doors of 4 NYP, near where Plaintiff was photographing.

18.     One of the individuals that exited through the doors of 4 NYP while Plaintiff was photographing was Defendant CAPTAIN MARK IOCCO.

19.     At about the same time that Defendant CAPTAIN MARK IOCCO approached Plaintiff, Defendants JOHN DOE ARRESTING OFFICER  AFRICAN-

AMERICAN SERGEANT, NYPD PO IVAN BAUTISTA, and NYPD PO DANIEL CROSS, were standing in close proximity to both the Plaintiff and Defendant CAPTAIN MARK IOCCO.

20.    Defendant CAPTAIN MARK IOCCO asked Plaintiff if he had a press pass.

21.    Plaintiff responded in sum and substance, he believed he had the right to photograph and document the arrests regardless of whether he had a press pass.

22.    Defendant CAPTAIN MARK IOCCO responded in sum and substance, that Plaintiff did not have any such right and that he was being arrested.

23.    During the entire time this interaction occurred, Defendant JOHN DOE ARRESTING OFFICER AFRICAN-AMERICAN SERGEANT, NYPD PO IVAN BAUTISTA, and NYPD PO DANIEL CROSS, were each very close to where the interaction was taking place, and upon information and belief, could each hear the entire interaction between Defendant CAPTAIN MARK IOCCO and Plaintiff.

24.    Upon being informed that he was being arrested, Plaintiff turned and put his hands behind his back.

25.    Defendant CAPTAIN MARK IOCCO, even though the Plaintiff was cooperating, aggressively grabbed the Plaintiff's hands behind Plaintiff's back.

26.    Defendant CAPTAIN MARK IOCCO placed one of his hands over both of Plaintiff's hands and pushed Plaintiff's hands up the back of Plaintiff's back causing pain and discomfort.

27.    Defendant CAPTAIN MARK IOCCO then violently and aggressively pushed the Plaintiff face first into the brick wall that was part of 4 NYP.

28.     Due to having his hands held behind his back, Plaintiff's first point of contact with the brick wall was his nose and his forehead.

29.     Due to this excessive and unreasonable force, Plaintiff suffered headaches for approximately 90 hours after being slammed face first into a brick wall.

30.     Thereafter, Plaintiff was detained in the back of a hot, crowded, police transport vehicle, driven to the precinct, and moved into a holding cell and held for approximately forty (40) hours by the NYPD before being arraigned.

## II. JURISDICTION

31.     This action is brought pursuant to 42 U.S.C. §§ 1983 and 1988, and the First, Fourth and Fourteenth Amendments to the United States Constitution. Jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1331, 1343(a)(3) and (a)(4) and the aforementioned statutory and constitutional provisions.

32.     Plaintiff ALEX GERSHKOVICH further invokes this Court's supplemental jurisdiction, pursuant to 28 U.S.C. § 1367, over any and all state law claims and causes of action which derive from the same nucleus of operative facts and are part of the same case or controversy that gives rise to the federally-based claims and causes of action.

## III.  VENUE

33.     Venue is proper for the United States District Court for the Southern District of New York, pursuant to 28 U.S.C. § 1391(a), (b), and (c) and § 1402(b) because the claims arose in this district.

## IV. JURY DEMAND

34.     Plaintiff ALEX GERSHKOVICH respectfully demands a trial by jury of all issues in this matter pursuant to Fed. R. Civ. P. 38(b).

## V. THE PARTIES

35.     Plaintiff ALEX GERSHKOVICH ("the Plaintiff") is a resident of the State, City and County of New York, who was lawfully present on the sidewalk in downtown New York City on September 17, 2012 and participating in expressive speech activity related to the First Anniversary of Occupy Wall Street when he was arrested and charged with two counts of trespass and one count of disorderly conduct. Mr. GERSHKOVICH was detained for approximately (40) hours in connection with this arrest.

36.     Defendant THE CITY OF NEW YORK was and is a municipal corporation duly organized and existing under and by virtue of the laws of the State of New York.

37.     Defendant THE CITY OF NEW YORK maintains the New York City Police Department, a duly authorized public authority and/or police department, authorized to perform all functions of a police department as per the applicable sections of the New York State Criminal Procedure Law, acting under the direction and supervision of the aforementioned municipal corporation, THE CITY OF NEW YORK.

38.     At all times relevant herein, Defendant Former Chief of Patrol Joseph Esposito ("Chief Esposito") was a duly sworn police officer of the NYPD.  At all times relevant to the conduct of the NYPD, he was the second highest ranking member of the NYPD, responsible for the policy, practice, supervision, implementation, and conduct of virtually all NYPD matters and responsible for the appointment, training, supervision, and conduct of virtually all of the NYPD members of service including the highest ranking NYPD personnel. Chief Esposito is sued in his individual and official capacities.

39.     Defendant New York City Police Chief Thomas P. Purtell ("Chief Purtell") was a duly sworn police officer of the NYPD.  On September 17, 2012, Chief Purtell was the incident commander of the NYPD policing of Occupy Wall Street activities.  Chief Purtell was commander of Patrol Borough Manhattan South, responsible for the policy, practice, supervision, implementation, and conduct of many NYPD matters and responsible for the appointment, training, supervision, and conduct of many of the NYPD members of service including high ranking NYPD personnel. Chief Purtell is sued in his individual and official capacities.

40.     Defendant New York City Police Deputy Chief Steven Anger ("Chief Anger") was a duly sworn police officer of the NYPD.  On September 17, 2012, Chief Anger was one of two aides to the incident commander of the NYPD policing of Occupy Wall Street activities.  Chief Anger was an assistant to the commander of Patrol Borough Manhattan South, responsible for the policy, practice, supervision, implementation, and conduct of many NYPD matters and responsible for the appointment, training, supervision, and conduct of many of the NYPD members of service including high ranking NYPD personnel.  Chief Anger is sued in his individual and official capacities.

41.     Defendant New York City Police Deputy Chief James McNamara ("Chief McNamara") was a duly sworn police officer of the NYPD.  On September 17, 2012, Chief McNamara was one of two aides to the incident commander of the NYPD policing of Occupy Wall Street activities.   Chief McNamara was responsible for the policy, practice, supervision, implementation, and conduct of many NYPD matters and responsible for the appointment, training, supervision, and conduct of many of the NYPD

members of service including high ranking NYPD personnel. Chief McNamara is sued in his individual and official capacities.

42.    The Defendants listed in paragraphs 40 – 43 are hereafter collectively referred to as the Chief Defendants.

43.    Defendant NEW YORK POLICE CAPTAIN MARK IOCCO ("CAPTAIN IOCCO") was a duly sworn police officer of said department and was acting under the supervision of said department and according to his official duties. On September 17, 2012, CAPTAIN IOCCO was a supervisor of officers involved in the NYPD policing of Occupy Wall Street activities.

44.    Defendant NYPD PO IVAN BAUTISTA  a duly sworn police officer of said department and was acting under the supervision of said department and according to his official duties. Defendant NYPD PO IVAN BAUTISTA  aided in holding Plaintiff against a wall and applying plastic flexicuffs to plaintiff.

45.    Defendant  "JOHN DOE ARRESTING OFFICER AFRICAN-AMERICAN SERGEANT" was a duly sworn police officer of said department and was acting under the supervision of said department and according to his official duties. Defendant "JOHN DOE ARRESTING OFFICER AFRICAN-AMERICAN SERGEANT" aided in holding Plaintiff against a wall and applying plastic flexicuffs.

46.     Defendant NYPD PO DANIEL CROSS was a duly sworn police officer of said department and was acting under the supervision of said department and according to his official duties. Defendant NYPD PO DANIEL CROSS was one of the officers that physically arrested Plaintiff.

47.     Plaintiff ALEX GERSHKOVICH will amend this complaint to identify Defendant  "JOHN DOE ARRESTING OFFICER AFRICAN-AMERICAN SERGEANT" by his true name, as his identity can be established to a reasonable certainty.

48.     The individual police officers, whether identified by their true names or by "John Doe" names, will be collectively referred to as the Defendant POLICE OFFICERS.

49.     Each and all of the acts of the Defendant POLICE OFFICERS alleged herein were done by said defendants while acting within the scope and in furtherance of their employment by Defendant THE CITY OF NEW YORK, and were acting under the supervision of said department and according to their official duties.

## VI. FACTS COMMON TO ALL CLAIMS

### OCCUPY WALL STREET

50.     The Plaintiff, Alex GERSHKOVICH, was a participant in the Occupy Wall Street ("OWS") movement.

51.     OWS, among other things, protests the institutionalized inequality that funnels political power, wealth, and resources to a tiny fraction of people and their corporations, and denies the vast majority of ordinary Americans and people their fair share.  In particular, OWS sought, and seeks, to bring attention to the unfair way in which ordinary people are allowed to suffer terrible hardship due to mortgage debt, student loan debt, or lack of affordable healthcare, as politicians and businessmen blame these people for "irresponsibility," while huge banks were rescued from any consequences of their own decision-making and actions by government bailouts funded by those same ordinary people's taxes.

11

52.     On September 17, 2011, the first OWS march occurred in the Financial District of Manhattan and the protesters were blocked from entering the Wall Street area by the NYPD, who had set up narrow choke points of ingress and egress.  The protesters found their way to Zuccotti Park and remained there for almost two months effectuating their political speech goals of drawing attention and raising awareness to the many issues of inequity.

53.     During this period, the NYPD continually arrested members of OWS for peaceful protest activity, and for documenting such activity by means of photography and video.  For example, on September 19, 2011, individuals associated with OWS marched from Zuccotti Park to the financial center area and back to Zuccotti Park.  During this march, NYPD Inspector Edward Winski reached across a police barricade and tried to drag an individual over the barricade.  The New York Times wrote about this arrest and the police statements regarding the conduct underlying this arrest:

> Another man was arrested, and the police initially said he was charged with jumping a police barrier and resisting arrest. But a reporter and a photographer for the [NY T]imes who witnessed and documented the episode between the man in the orange hat and the police did not see him attempting to jump a barrier. Late in the afternoon, the police said the man was charged with committing disorderly conduct by impeding pedestrian traffic, not with jumping a barrier.

54.     The following day, September 20, 2011, a slightly rainy morning, Inspector Edward Winski, along with other officers, entered Zuccotti Park and unlawfully ordered the OWS media team to remove protective tarps from its computers and video-gear.

55.     Approximately three (3) individuals were arrested on that date, and sued Inspector Edward Winski and the City of New York, for the unlawful arrests.

56.     Initially, Inspector Edward Winski reported that the tarps had been hanging from trees and this allegation was part of the criminal complaint.  However, after the District Attorney of New York was alerted to video of the incident, a superseding complaint was filed removing the allegation that the tarps were tied to trees.

57.     Upon information and belief, Inspector Winski was not disciplined in any manner for his conduct of September 19 or 20, 2011 or for the misreporting of the facts in the initial criminal complaint.  Instead, Winski was promoted from Deputy Inspector to Inspector in November 2013.

58.     Over the course of the following year, numerous similar altercations occurred between the police and OWS, many resulting in lawsuits for improper arrests and the improper actions of the police towards protesters, including, among other things, pepper spraying individuals engaged in expressive speech activities.[1]

59.     Despite the numerous altercations and resulting arrests, most of the arrests culminated in dismissals, ACD's, or declined prosecutions.

60.     The NYPD crowd control protocols employed were similarly ineffective and indicative of the poorly tailored policies and procedures employed by the NYPD to handle the peaceful protests of OWS.  For example, on November 5, 2011, the success of an Occupy supported program, Bank Transfer Day - to have individuals move their

---

[1]Joseph Ax, *NY City To Pay $330,000 To Settle Pepper-Spray Occupy Lawsuits,* Reuters, http://www.reuters.com/article/2015/07/06/us-usa-occupy-lawsuit-idUSKCN0PG2GK20150706; *see also Laugier v. The City of New York, et al.,* 13CV6171 (JMF)(settling lawsuit stemming from OWS protest at Brooklyn Bridge); *Appel v. The City of New York, et al.*, 14CV7992 (KPF)(lawsuit from OWS protest at Foley Square); *Global Revolution TV v. City of New York, et al.*, 12CV5086(GBD)(lawsuit related to property damage from police activity); *Occupy Wall Street, et al. v. City of New York*, 12CV4129(GBD)(same).

savings from institutional banks to community banks - was celebrated with a march from Zuccotti Park to Foley Square.   The New York Times wrote about the incident that occurred once the marchers reached Foley Square:

> Hundreds of Occupy Wall Street demonstrators streamed into a desolate part of Foley Square on Saturday afternoon, but their slow-moving march turned chaotic as a phalanx of police officers issued orders to vacate the sidewalks — and then swept in to force the issue…. As the confrontation continued, the police kept yelling orders that the sidewalk was closed, or temporarily closed, or had to be closed to keep order. They fanned out in a line, stretching orange mesh netting across the breadth of the sidewalk, and walked along, pushing protesters back and sweeping them away.
>
> The strategy drew expressions of puzzlement from many in the area.
>
> "The police warned these people to move because of pedestrian traffic, but this is an empty place," said Robert Rosen, 66. "Who are they talking about?"[2]

61.     The arbitrary and unreasonable crowd control measures employed by the NYPD were documented and analyzed in the Suppressing Protest Report:[3]

> The pervasive NYPD practice of frequently "closing" sidewalks and forcibly moving along peacefully assembled individuals violates the freedoms of expression and assembly. There may be circumstances in which the closure of otherwise public space is a proportionate and necessary measure to achieve a legitimate aim, such as public safety. Dispersal and closure may be appropriate where, for example, a protest has taken on a violent character, and the closure is needed to restore public order. But mere assembly on public sidewalks is not just cause to move protesters on, or to "close" a sidewalk. If protesters are in fact actually "blocking" pedestrian traffic, whether intentionally or inadvertently, police should facilitate

---

[2] Al Baker, *Police Force Wall Street Protesters Off Sidewalks*, NY TIMES, http://cityroom.blogs.nytimes.com/2011/11/05/police-force-wall-street-protesters-off-sidewalks/.

[3] Suppressing Protest Report at 118.

assembly rights by informing protesters that they are free to protest on sidewalks, and should assist protesters to ensure that building entrances are not blocked and that others may pass.

The NYPD's frequent practice of "closing" sidewalks during protests also appears to violate U.S. constitutional law, which protects First Amendment activity on public sidewalks. The U.S. Supreme Court has held that:

[W]hen the use of its public streets and sidewalks is involved….a [government] may not empower its….officials to roam essentially at will, dispensing or withholding permission to speak, assemble, picket, or parade according to their own opinions regarding the potential effect of the activity in question on the "welfare," "decency," or "morals" of the community.

Many areas of New York City are heavily congested with pedestrian traffic, and the difference in treatment between congested resident or tourist pedestrian traffic and protester pedestrian traffic is at times stark. Lawyers described the police enforcement against protesters of the disorderly conduct statute for blocking pedestrian traffic as a tactic to "stifle political protest" that, when combined with physical force, created "a climate of fear."

62.    Mayor Michael Bloomberg recognized that, "the majority of the protesters have been peaceful and responsible."[4] Yet, the majority of the protestors who were arrested were taken into police custody, whether for hours or for days, rather than simply being given a summons.

63.    Furthermore, between September 17, 2011 and September 17, 2012 – in Manhattan alone – 2,644 members of OWS were arrested. Only 409 of these arrests resulted in a plea or conviction for any charge.  That is a conversion rate of just over 15%

---

[4] Michael Bloomberg, *Michael Bloomberg's Statement on the Zuccotti Park Clearance*, GUARDIAN (Nov. 15, 2011, 8:39 EST), http://www.guardian.co.uk/world/2011/nov/15/michael-bloomberg-statement-zuccotti-park.

for the thousands of Occupy Wall Street related arrests during the one-year period.  The remainder of the arrests, the overwhelmingly vast majority, were dismissed.

64.     Indeed, further proof of the improper policing of members of Occupy Wall Street can be seen by the voluminous litigation that has arisen related to the improper policing of the constitutionally protected expressive speech activity.

65.     Since 2011, more than eighty (80) separate litigations have been filed in the Southern District of New York alone.  Approximately fifty (50) of these litigations have been settled at a cost in excess of $1,500,000 dollars, not including the defense costs associated with these matters.  See paragraphs 143 & 144.

66.     Seventeen (17) of these litigations were filed before September 15, 2012, and the First Anniversary of OWS, the date of the Plaintiff's arrest.

67.     Defendant CAPTAIN MARK IOCCO's purposeful intervention in Plaintiff's attempt to photograph and document the arrests of individuals inside 4 NYP was in direct violation of the First Amendment, as well as  the long-standing NYPD written policy.

68.     In 1977 the City of New York and its then-Police Commissioner settled a federal lawsuit by entering into a consent decree in the class action Black v. Codd, 73 Civ. 5283 (JNC), which stated, in relevant part, as:

> It is stipulated by and between the attorneys for the parties herein that it is the policy of the New York City Police Department and the defendants that when a person ( or persons) is detained, stopped or arrested in public areas, a person or persons not involved in the conduct for which the first person is stopped or arrested may remain in the vicinity of the stop or arrest as an onlooker or onlookers, subject to the safety of the person stopped, the third persons, the general public, and officers of the Police Department, and to provisions of law e.g. P.L. 195.05.
>
> In the following provisions, the term "officer" refers to New York City police officers, agents of the defendants:
>
> 1.    A person remaining in the vicinity of a stop or arrest (herein after an "onlooker") shall not be subject to arrest for violation of

Penal Law § 195.05 unless the officer has probable cause to believe that a violation of Section 195.05 exists.

2.    None of the following constitute probable cause for arrest or detention of an onlooker unless the safety of officers or other persons is directly endangered or the officer reasonably believes they are endangered or the law is otherwise violated;
   a)    Speech alone, even though crude and vulgar;
   b)    Requesting and making notes of shield numbers or names of officers;
   c)    Taking photographs;
   d)    Remaining in the vicinity of the stop or arrest.

3.    Whenever an onlooker is arrested or taken into custody, the arresting officer shall report the action to the supervisor at the station house or other place where the person is taken.

4.    Defendants shall notify all officers and other employees of the Police Department of the terms of this stipulation by appropriate department order within 60 days of the entry of this order. Such order shall embody the terms of paragraphs 1 through 3 of this order. Area commanders will be informed that the basis for the said departmental order is the settlement of this litigation and that the terms of this order are part of the departmental order. Area commanders shall inform precinct commanders of the existence of this order.

The above provisions of this order shall and the same hereby do constitute the final judgment of this court upon the controversy between defendants, Plaintiffs and the Plaintiff class.

69.    Even though this consent decree became part of the NYPD Patrol Guide, police violations of the right to observe and document police activity continued.  Due to numerous complaints by Press Organizations, Civil Rights groups and members of the public, concerning the regular violations of First Amendment rights and this consent decree, the NYPD issued a "Finest Message" in or about the summer of 2014, which highlighted the rights protected under the First Amendment, agreed upon in Black v. Codd, and incorporated into the NYPD Patrol Guide:

ALL COMMANDS

RE: RECORDING OF POLICE ACTION BY THE PUBLIC
MEMBERS OF THE SERVICE ARE REMINDED THAT MEMBERS
OF THE PUBLIC ARE LEGALLY ALLOWED TO RECORD (BY
VIDEO, AUDIO, OR PHOTOGRAPHY) POLICE INTERACTIONS.

THESE INTERACTIONS INCLUDE ARREST AND OTHER

SITUATIONS. MEMBERS OF THE SERVICE WILL NOT
INTERFERE WITH A PERSON'S USE OF RECORDING DEVICES TO
RECORD POLICE INTERACTIONS. INTENTIONAL
INTERFERENCE SUCH AS BLOCKING OR OBSTRUCTING
CAMERAS OR ORDERING THE PERSON TO CEASE
CONSTITUTES CENSORSHIP AND ALSO VIOLATES THE FIRST
AMENDMENT.

IT SHOULD BE NOTED, HOWEVER, THAT PERSONS MAY NOT
INTERFERE WITH POLICE OPERATIONS. MEMBERS, IF
APPROPRIATE, SHOULD ADVISE THE PUBLIC NOT TO GET TOO
CLOSE AND MAY TAKE ACTION ONLY IF THE PERSON
INTERFERES WITH THE OPERATION OR THE SAFETY OF THE
MEMBERS OF THE SERVICE OR THE PUBLIC. HOWEVER, MERE
RECORDING OF AN INCIDENT DOES NOT CONSTITUTE
INTERFERENCE. COMMANDING OFFICERS WILL ENSURE THAT
THE CONTENTS OF THIS MESSAGE ARE DISSEMINATED TO
ALL MEMBERS OF THE SERVICE.

70.     Even before the Occupy Wall Street movement, due to the NYPD's failure

to properly police the large protests surround the Republican National Convention that

cost the City of New York in excess of thirty million dollars, Defendants understood their

officers needed training in policing expressive speech activity.[5]

71.     In fact, even before the RNC, the City of New York was sued for

violations of individuals rights to protest on the sidewalk and space in front of a

commercial building, Kunstler v. City of New York, 04-CV-1145(RWS)(MHD).  This

matter settled in in 2008 for an amount in excess of two million ($2,000,000.00) dollars.

72.     In anticipation of Occupy Wall Street, the City of New York, and the

Chief Defendants did conduct large-scale training for the NYPD in August 2011 on

Randall's Island, but this training did not address First Amendment issues or how

expressive speech activity affected the proper policing methods of mass protest.  Instead,

this training included policing and formations to be used to splinter and control mass

---

[5] The City paid approximately $18 million dollars in damages and fees to Plaintiffs, and
spent $16 million defending the lawsuits to outside counsel and the NYC Law
Department. http://www.reuters.com/article/2014/01/15/us-usa-newyork-rnc-settlement-
idUSBREA0E1S120140115.

protest.  This training included non-verbal commands for disorder control formations such as that holding both arms flat out to each side indicates line formation; and holding both arms extended in a circle above your head is encirclement formation.

73.     Importantly, and unfortunately for the innumerable protesters whose rights were violated, the August 2011 training did not include any training about proper policing of expressive speech activity protected by the First Amendment.  Nor did this training include the proper standards for respecting the rights of individuals photographing, videotaping, live streaming and documenting First Amendment Activity and police civilian interactions.

74.     Furthermore, the inadequacy of the training was continually highlighted over the following year by the extensive arrests, the exceptional dismissal rate, and the resulting lawsuits.  Additionally, the vehement public reaction and subsequent reports, such as the Suppressing Protest Report which even tried to directly engage with the NYPD, detailed and highlighted the unlawful policies and arrests.[6]

75.     Instead of taking necessary steps to curb the number of unlawful arrests of Occupy Wall Street protestors during the year leading up to the Plaintiff's arrest, the NYPD made no policy changes, even though the vast majority of the 2,644 arrests resulted in a form of dismissal.

76.     Further, the NYPD and the Chief Defendants made no effort to find out why so many OWS arrests were not prosecuted by the District Attorney's office, or why so many arrests were dismissed.  Nor did the Chief Defendants consider changing the policies or procedures as a result of the dismissal rate.

---

[6] See Suppressing Protest at Appx. II.

77.     The City of New York, and the Chief Defendants never corrected the implemented policies by training, and never conducted training to prevent or address the problematic policies, and instead in an exhibition of deliberate indifference and/or deliberate disregard allowed these bad activities to occur, in violation of the First Amendment.

78.     OWS protests were policed not merely by patrol officers, but by high-ranking officers such as the Chief Defendants, among others.

79.     These high-ranking officers had the ability to observe that NYPD officers incorrectly understood and applied the law of First Amendment activities, including those spelled out in the Black v. Codd consent decree.

80.     These high ranking officers had the ability and the duty to set policies that would prevent NYPD officers from making unlawful arrests because of a failure to understand the law.

81.     These high ranking officers had the ability and the duty to ensure that NYPD officers had training that would prevent the officers from making unlawful arrests because of a failure to understand the law.

**Police Officers in Charge of the Arrests**

82.     On September 17, 2012, Defendant Police Assistant Chief Thomas Purtell was the member of the NYPD who was the highest uniformed ranking police supervisor assuming command.  Further, Chief of Department Joseph Esposito was the second in command to NYPD Commissioner Ray Kelly, having command over Patrol Services Bureau, Patrol Borough Manhattan South, Assistant Chief Thomas Purtell, and the officers detailed to the OWS anniversary on September 17, 2012.  Moreover, in 2011 and

2012, the Chief Defendants were employees of the NYPD who were identified by the NYPD as having "substantial policy discretion" and thus policy makers of the NYPD and the City of New York.

83.     As the Incident Commander of the Occupy Wall Street event on September 17, 2012, Assistant Chief Purtell was responsible for the overall management of the policing activities concerning the event.

84.     As described within Section 213-11 of the NYPD Patrol Guide, *Policing Special Events/Crowd Control,* as the Incident Commander of the Occupy Wall Street event on September 17, 2012, Assistant Chief Purtell was responsible for the command, control and coordination of all incident operations, including the supervision of all police officers there that day.

85.     In anticipation of the expected expressive speech activity to occur in downtown Manhattan in the days leading up to and on the day of the anniversary of the first march of Occupy Wall Street, Assistant Chief Purtell, along with his two aides, Chiefs Anger and McNamara, prepared a Patrol Borough Manhattan South Detail, that set out which supervising officers would be working on September 17, 2012, and the location and basic duties of their tour for the day.

86.     The majority of the NYPD officers detailed to the First Anniversary of Occupy Wall Street were members of, and supervised by, the Patrol Services Division; in particular, Patrol Borough Manhattan South, which was under the command of Chief Purtell.

87.     On September 17, 2012 alone, there were more than 1,300 police officers from the Patrol Services Bureau deployed to the immediate area around Wall Street.

Further, more than 150 additional officers were deployed to Zuccotti Park and 40 mounted police units were deployed.

88.     Upon information and belief, the Chief Defendants, were aware of the fact that large numbers of the police officers assigned to police OWS events were not properly trained, and did not have a proper understanding of the law governing lawful arrests at such events, or the rights of individuals to photograph and document police civilian interactions.

89.     Upon information and belief, the Chief Defendants, took no steps to ensure that the officers assigned to the September 17, 2012 OWS anniversary events consisted of officers who were properly trained and had a proper understanding of the law governing lawful arrests at such events, or the rights of individuals to photograph and document police civilian interactions.

90.     Upon information and belief, the Chief Defendants, took no steps to ensure that the officers assigned to the September 17, 2012 OWS anniversary events performed their duties on that day with a proper understanding of the law governing lawful arrests at such events, or the rights of individuals to photograph and document police civilian interactions.

91.     Throughout the period of time from September 17, 2011 and through September 16, 2012, the Chief Defendants were aware of information that placed them on clear notice that officers under their command were pursuing arrest practices that violated the Constitutional rights of OWS protestors.

92.     Upon information and belief, throughout the period of time from September 17, 2011 and through September 16, 2012, the Chief Defendants did nothing

to impose, develop or modify any policies or practices that would prevent further unlawful arrests.

93.    Upon information and belief, the City of New York and  the Chief Defendants did not train officers assigned to OWS events in how to make lawful arrests, and how to avoid unlawful arrests, or how to respect the rights of individuals to photograph and document police civilian interactions.

94.    Upon information and belief, the City of New York and the Chief Defendants did not assign officers who had proper training to police such arrests.

**The First Anniversary of OWS**

95.    In the run-up to the First Anniversary of OWS, expressive activity increased and on September 15, 2012, twenty-seven (27) individuals were arrested which resulted in thirteen arrests (13) resolved with a dismissal, ACD, decline to prosecute and/or acquittal.  On September 16, 2012, fifteen (15) individuals were arrested which resulted in eleven (11) of those arrests resolved with a dismissal, ACD, declined prosecution, and/or acquittal.

96.    The September 15, 2012 on the ground events are detailed by the New York Times:

> [On September 15th at 8:30 p.m.], near Thames Street, a commander ordered the crowd to disperse, and a moment later officers pushed into the crowd, knocking down some protesters and arresting some.
>
> The police repeated that maneuver a few minutes later, and then pushed a group of protesters against the side of a building. One man objected, and an officer pulled him from the crowd and arrested him. At least two other arrests followed, with officers appearing to grab some people almost at random.

Across Broadway, a commander announced that protesters could not stand on a stretch of sidewalk. A man yelled that he had the right to be there and the commander chased him for several feet before the man scrambled away.

By 9 p.m., almost all of the remaining protesters left the area as a line of officers advanced toward a group standing on the corner of Liberty Street and Broadway while a captain announced through a megaphone that the group was blocking pedestrian traffic.[7]

97.     On September 17, 2012, thousands of individuals came to New York City to meet all across downtown Manhattan, celebrate the First Anniversary of Occupy Wall Street and participate in expressive speech activity.

98.     Nonetheless, the Defendants failed to assign officers to these expressive speech activities who understood the proper policing of constitutionally protected activity, including the proper policing of individuals documenting interactions between members of the NYPD and civilians.

99.     On September 17, 2012, the First Anniversary of Occupy Wall Street was celebrated around the world, including all around downtown Manhattan.

100.     According to records provided by the New York County District Attorney's office, a report, under a notation "Happy Birthday OWS", listed on this date over one-hundred and eighty (180+) individuals arrested in relation to OWS anniversary expressive speech activity (of which 88% were resolved with a decline to prosecute, dismissal, or ACD).

101.     Upon information and belief, Defendant CAPTAIN MARK IOCCO arrested Plaintiff knowing that the Plaintiff did not commit any violation or offense.

---

[7] Colin Moynihan, *Several Arrests at Occupy Wall Street March*, NY TIMES, http://www.nytimes.com/2012/09/16/nyregion/several-arrests-at-occupy-wall-street-march.html.

102.     Upon information and belief, Defendant CAPTAIN MARK IOCCO arrested Plaintiff in retaliation for Plaintiff's participation in expressive speech activity, including the OWS one year anniversary, and in photographing the arrests inside 4 NYP.

103.     On the morning of September 17, 2012, Plaintiff Alex GERSHKOVICH was involved in expressive speech activity in downtown Manhattan when he was unlawfully detained, physically assaulted and arrested by defendant members of the NYPD.

104.     Defendants JOHN DOE ARRESTING OFFICER  AFRICAN-AMERICAN SERGEANT, NYPD PO IVAN BAUTISTA, and NYPD PO DANIEL CROSS, CAPTAIN MARK IOCCO chose not to intervene to prevent the Plaintiff's arrest, despite having the ability and the opportunity to do so.

105.     Following Plaintiff' unlawful arrest, the Defendant POLICE OFFICERS transported Plaintiff to One Police Plaza.

106.     There the Defendant POLICE OFFICERS detained Plaintiff for approximately eight (8) hours.

107.     Defendant POLICE OFFICERS then transferred Plaintiff to Central Booking.

108.     There the Defendant POLICE OFFICERS detained Plaintiff for approximately thirty-two  (32) hours.

109.     After five (5) court appearances, the charges against the Plaintiff for Criminal Trespass in the Third Degree, Trespass and Disorderly Conduct were all dismissed on or around May 10, 2013, by the New York County District Attorney's office.

## CHIEF PURTELL, CHIEF MCNAMARA AND CHIEF ANGER FAILED TO ADEQUATELY SUPERVISE THE OTHER DEFENDANT POLICE OFFICERS

110.     On September 17, 2012, the CHIEF DEFENDANTS were the members of the NYPD who were the highest uniformed ranking police supervisors assuming command.

111.     As the Incident Commander of the Occupy Wall Street event on September 17, 2012, the CHIEF DEFENDANTS were responsible for the overall management and supervision of the policing activities concerning the event, including command of the other Defendant POLICE OFFICERS.

112.     The Defendants NYPD, City of New York  and Chief Defendants, failed to properly train the officers of the NYPD in relation to how the exercise of Constitutional Rights affects the policing of protests, including policing individuals involved in documenting expressive speech activity and documenting through photographs, video, live streaming interactions between the NYPD and civilians.

113.     The Defendants NYPD, City of New York and Chief Defendants, failed to train its officers in First Amendment rights.

114.     The Defendants NYPD and Chief Defendants, failed to train the NYPD in the proper policing of expressive speech activity protected by the First Amendment to the United States Constitution.

115.     The Defendants NYPD and Chief Defendants, failed to supervise officers of the NYPD during the policing of expressive speech activity protected by the First Amendment to the United States Constitution.

116.    The Defendant City of New York showed deliberate indifference to the rights of members of Occupy Wall Street by failing to properly train the Commanding Officer of the First Precinct.

117.    The Defendant City of New York showed deliberate indifference to the rights of members of Occupy Wall Street by failing to properly supervise the officers who were assigned to police Occupy Wall Street.

118.    The Defendant City of New York showed deliberate indifference to the rights of members of Occupy Wall Street by failing to properly train the officers who were assigned to police Occupy Wall Street.

<u>FIRST CLAIM FOR RELIEF</u>

<u>DEPRIVATION OF FEDERAL CIVIL RIGHTS UNDER 42 U.S.C. § 1983</u>

119.    Plaintiff repeat and re-allege each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

120.    The defendants violated the Plaintiff rights by searching Plaintiff, falsely arresting and imprisoning Plaintiff, assaulting Plaintiff, maliciously prosecuting Plaintiff, abusing process against Plaintiff, violating and retaliating for Plaintiff s exercise of his rights to free speech and assembly, failing to intercede on behalf of the Plaintiff and in failing to protect the Plaintiff from the unjustified and unconstitutional treatment he received at the hands of other defendants, defendants NYPD ASSISTANT CHIEF THOMAS  P. PURTELL, NYPD DEPUTY CHIEF STEVEN   ANGER, NYPD DEPUTY CHIEF JAMES  MCNAMARA NYPD CAPTAIN MARK IOCCO, NYPD PO IVAN BAUTISTA, NYPD PO OFFICER DANIEL CROSS,  AFRICAN-AMERICAN SERGEANT, DOES acting under color of law and without lawful justification,

intentionally, maliciously, and with a deliberate indifference to or a reckless disregard to the Plaintiff's rights.

121.    As a result of the foregoing, Plaintiff was deprived of his liberty, experienced injury, pain and suffering, emotional injury, costs and expenses, and was otherwise damaged and injured.

<u>SECOND CLAIM FOR RELIEF</u>

<u>DEPRIVATION OF FEDERAL CIVIL RIGHTS UNDER 42 U.S.C. § 1983</u>

122.    Plaintiff repeat and re-allege each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

123.    By their conduct in failing to remedy the wrongs committed by their subordinates and in failing to properly train, supervise, or discipline their subordinates, supervisory defendants FORMER NYPD CHIEF OF PATROL JOSEPH ESPOSITO, NYPD ASSISTANT CHIEF THOMAS  P. PURTELL, NYPD DEPUTY CHIEF STEVEN  ANGER, NYPD DEPUTY CHIEF JAMES MCNAMARA, caused damage and injury in violation of Plaintiff's rights guaranteed under 42 U.S.C. § 1983 and the United States Constitution, including its First, Fourth, and Fourteenth amendments.

124.    As a result of the foregoing, Plaintiff was deprived of his liberty, experienced injury, pain and suffering, emotional injury, costs and expenses, and was otherwise damaged and injured.

<u>THIRD CLAIM FOR RELIEF</u>

<u>LIABILITY OF DEFENDANT THE CITY OF NEW YORK FOR<br>CONSTITUTIONAL VIOLATIONS</u>

125.    Plaintiff repeat and re-allege each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

126.    At all times material to this complaint, defendant THE CITY OF NEW YORK, acting through its police department, and through the individual defendants had de

facto policies, practices, customs and usages which were a direct and proximate cause of the unconstitutional conduct alleged herein.

127.   At all times material to this complaint, defendant THE CITY OF NEW YORK, acting through its police department, and through the individual defendants, had de facto policies, practices, customs, and usages of failing to properly train, screen, supervise, or discipline employees and police officers, and of failing to inform the individual defendants' supervisors of their need to train, screen, supervise or discipline said defendants. These policies, practices, customs, and usages were a direct and proximate cause of the unconstitutional conduct alleged herein.

128.   At all times material to this complaint, defendant THE CITY OF NEW YORK, acting through its police department, and through the individual defendants, had de facto policies, practices, customs, and usages of encouraging and/or tacitly sanctioning the violation of and/or retaliation for individuals' exercise of free speech and association in a manner that affronts police officers or is interpreted by police officers as challenging their authority or documenting or reporting their misconduct, including filming them. These policies, practices, customs, and usages were a direct and proximate cause of the unconstitutional conduct alleged herein.

129.   At all times material to this complaint, the defendant THE CITY OF NEW YORK, acting through its police department and through the individual defendants, had de facto policies, practices, customs and/or usages of encouraging and/or tacitly sanctioning the cover-up of other law enforcement officers' misconduct, through the fabrication of false accounts and evidence and/or through "the blue wall of silence." Such policies, practices, customs and/or usages are a direct and proximate cause of the unconstitutional conduct alleged herein.

130.   At all times material to this complaint, the defendant THE CITY OF NEW YORK, acting through its police department and through the individual defendants, had de facto policies, practices, customs and/or usages of engaging in unconstitutional false arrests and related malicious prosecutions, and in unconstitutional, violent, and overly aggressive

actions toward individuals perceived as being affiliated with the Occupy Wall Street movement. These policies, practices, customs and/or usages are a direct and proximate cause of the unconstitutional conduct alleged herein.

131.   At all relevant times herein, Defendant City of New York established and/or followed policies, procedures, customs, and or practices, and those policies were the cause of violation of the Plaintiff's constitutional rights granted pursuant to 42 U.S.C. § 1983, as well as the case of *Monell v. New York City Dep't of Social Services*, 436 U.S. 658 (1978), including those under the First, Fourth, and Fourteenth Amendments.  All of the aforementioned acts of the Chief Defendants, their agents, servants and employees, were carried out under the color of state law.

132.   The City of New York, and the Chief Defendants at all times relevant had a duty to the Plaintiff to make the appropriate choice to (1) establish, implement and follow policies, procedures, customs, and or practices which conform to and provide for the protections guaranteed to Plaintiff under the United States Constitution, including the First, Fourth, and Fourteenth Amendment; (2) select, supervise, train, control, and review the activities of all agents, servants, employees, and police officers in their employ, and (3) refrain from deliberate indifference to the Constitutional rights of the Plaintiff so as to not cause him injuries and damages alleged herein.

133.   The City of New York, and the Chief Defendants breached their duties and obligations to the Plaintiff, making the wrong choice when: (1) failing to establish, implement, and follow the correct Constitutional policies, procedures, customs, and/or practices; (2) failing to properly select, supervise, train, control, and review the activities of their agents, servants, employees, and police officers as to their compliance with Constitutional safeguards; (3) permitting their agents, servants, employees, and police

officers to engage in the unlawful and unconstitutional conduct alleged herein; and (4) exercising, at a minimum, deliberate indifference towards the Constitutional protections afforded to the Plaintiff by disregarding the numerous lawsuits, statistical evidence, and reports indicating that the policies, procedures, customs, and/or practices were improper and violated the Plaintiff's Constitutional rights.

134.     Furthermore, the members of the NYPD carried out the alleged conduct in their capacities as police officers and under the color of state law, pursuant to the policies, procedures, customs, and/or practices of the Defendant the City of New York and the NYPD, all under the supervision of the Chief Defendants.

135.     Defendants knew, or should have known, that by breaching the aforesaid duties and obligations, it was foreseeable that these choices would and did cause Plaintiff to be injured and damaged as a result of the constitutionally impermissible conduct undertaken pursuant to the policies, procedures, customs, and/or practices, and that such decisions occurred in contravention of public policy and their legal duties and obligations to Plaintiff.

136.     The decisions, actions, and inactions, of Defendants and their agents are the legal cause of injuries to Plaintiff as alleged herein and, as a result, Plaintiff has sustained general and special damages, as well as incurring attorneys' fees, costs, and expenses, including those as authorized by 42 U.S.C. § 1988, to an extent and in an amount subject to proof at trial.

137.     The acts complained of were carried out by the aforementioned individual defendants in their capacities as police officers, with all of the actual and/or apparent authority attendant thereto.

138.    The acts complained of were carried out by the aforementioned individual defendants in their capacities as police officers, pursuant to the customs, usages, practices, procedures, and the rules of Defendant THE CITY OF NEW YORK and the New York City Police Department, all under the supervision of ranking officers of said department.

139.    The Defendant POLICE OFFICERS collectively and individually, while acting under color of state law, engaged in Constitutionally-violative conduct that constituted a custom, usage, practice, procedure or rule of the respective municipality/authority, which is forbidden by the Constitution of the United States.

140.    The existence of the aforesaid unconstitutional customs and practices, specifically with regard to the use of excessive force, unlawful detention, interference with protected First Amendment activity, retaliatory use of force, malicious prosecutions, abuse of process and deprivation of liberty without due process of law against individuals apparently associated with Occupy Wall Street while engaged in protected First Amendment activity, are further evidenced, *inter alia,* by the hundreds of incidents - including the incident involving the Plaintiff herein, as set forth above - involving questionable arrests and uses of force by NYPD officers against OWS protestors documented in the press and compiled by The Global Justice Clinic at the New York University School of Law and the Walter Leitner International Human Rights Clinic at the Leitner Center for International Law and Justice at Fordham Law School in their publication entitled "Suppressing Protest: Human Rights Violations in the U.S. Response to Occupy Wall Street," published July 25, 2012, *available online at* http://chrgj.org/wp-content/uploads/2012/10/suppressingprotest.pdf (last visited March 10, 2016).

141.    Numerous civil rights cases have also been filed in this district (most pending, and some settled or resolved by accepted Rule 68 Offer - information concerning amounts

provided as available) arising out of allegations of, *inter alia*, false arrest and excessive force that occurred in relation to OWS.

142.    Below is a possibly incomplete list updated as of March 9, 2016 indicating 31 open cases related to Occupy Wall Street (including three class actions) and 56 settled cases (ranging from $12,500 to $598,000).

143.    Some of these settled cases are (settlement information last updated on March 9, 2016):

Settled Cases:

| Caption | Index | Settlement |
|---|---|---|
| Adona v. NYC, et al | 12-cv-7458 (HB) | Rule 68 $25,001 + $35,000 fees |
| Adsluf v. NYC, et al | 13–cv-2295 (LGS) | settled $40,000 |
| Appel v. NYC, et al | 14-cv-07992 (KPF) | settled $20,000 |
| Arce v. NYC, et al | 13-cv-8486 (PKC) | settled $22,500 |
| Baglieri v. NYC, et al | 12-cv-07012 (HB) | settled |
| Ball v. NYC, et al | 13-cv-05563 (RWS) | settled |
| Boss v. NYC, et al | 12-cv-8728 (GBD) | settled $55,000 |
| Brown v. NYC, et al | 13-cv-2058 (NRB) | settled $15,000 |
| Clarke. et al. v. NYC, et al | 13-cv-5303 (RWS) | settled Union Square 9/24/11 |
| Crisp v. NYC, et al | 12-cv-5842 (RWS) | settled Union Square 9/24/11 |
| Dedrick v. NYC, et al | 12–cv-7165 (RWS) | settled Union Square 9/24/11 |
| Dierken. et al. v. NYC, et al | 12-cv-07462 (RWS) | Settled $145,009, $112,500 fees Union Square 9/24/11 |
| Elliot. et al. v. NYC, et al | 12-cv-992 (RWS) | settled Union Square 9/24/11 |
| Fields v. NYC, et al | 13-cv-8819 (JGK) | settled $75,000, $15,000 |
| Freedman v. NYC, et al | 15-cv-01956 (JPO) | settled |

| | | |
|---|---|---|
| Friesdat v. NYC, et al | 14-cv-625 (JGK) | settled |
| Frydman v. NYC, et al | 12-cv-09394 (SAS) | settled |
| Global Revolution TV v. NYC, et al | 12-cv-5086 (GBD) | settled          $75,000, $50,000 fees |
| Gold v. NYC, et al | 13-cv-02142 (VSB) | settled |
| Hanlin v. NYC, et al | 12-cv-5844 (RWS) | settled    Union    Square 9/24/11 |
| Hopkins v. NYC, et al | 14-cv-09114 (LGS) | settled $25,000 |
| Iskender v. NYC, et al | 13-cv-2899  (RA) | settled $33500 |
| Jimenez v. NYC, et al | 14-cv-413 (RA) | settled |
| Knefel v. NYC, et al | 13-cv-08881(LTS) | settled $13,000 |
| Koznar v NYC, et al | 15-cv-01484 (SAS) | settled |
| Laugier v NYC, et al | 13-cv-6171 (HB) | settled, $85,000 |
| Lawler v. NYC, et al | 12-cv-5843 (RWS) | settled |
| Meighan v. NYC, et al | 12-cv-7929 (AKH) | settled $55,000 |
| Meltzer-Cohen v. NYC, et al | 14-cv-516 (SAS) | settled |
| Morris v. NYC, et al | 12-cv-07219 (SAS) | settled |
| Nelson v. NYC, et al | 14-cv-09249 (WHP) | settled |
| Occupy Wall Street et al. v. NYC, et al | 12-cv-4129 (GBD) | settled $47,000, $186,349.58 fees |
| Peat et al v. NYC, et al | 12-cv-8230 (SAS) | settled $598,000 |
| Penley v. NYC, et al | 14-cv-01577(JGK) | settled $25,001 plus $30,000  fees |
| Perloff v. NYC, et al | 13-cv-4175 (KBF) | settled |
| Powell et al v. NYC, et al | 14-cv-08138 (RMB) | settled |
| Premo v. NYC, et al | 13-cv-08141 (WHP) | settled |
| Rechtschaffer v. NYC, et al | 13-cv-0709 (JPO) | settled |
| Reinheart/Eastman v. NYC, et al | 13-cv-8314 (JPO) | settled $40,000 |
| Rivera-Pitre V. NYC, et al | | settled |
| Ross. et al. v. NYC, et al | 13-cv-5012 (VSB) | settled $22,000 |
| Russell  v. NYC, et al | 13-cv-9047 (ALC) | settled |
| Schmidt v. NYC, et al | 13-cv-961 (DLC) | settled $15,002 +$18,000 fees |

| Schoeckert v. NYC, et al | 13-cv-06342 (VEC) | settled |
| Schomburg v. NYC, et al | 12-cv-7161 (RWS) | settled |
| Schrader v. NYC, et al | 13-cv-1995 (HS) | settled $82,500 |
| Smith v. NYC, et al | 13-cv-02900 (JPO)(JLC) | settled $17,500 |
| Sterling. et al. v. NYC, et al | 12-cv-7086 (RWS) | settled Union Square 9/24/11 |
| Stoeckley & McGregor v. NYC, et al | 13-cv-6173 (VSB) | settled $57,000 |
| Time's Up. Inc v. NYC, et al | 13-cv-1081 (GBD) | settled $8500 |
| Treffs v. NYC, et al | 12-cv-3030 (HB) | settled $27,500 |
| Walker v. NYC, et al | 12-cv-09400 (LTS) | settled |
| Wilder v. NYC, et al | 14-cv-8953 | settled |
| Worden v. NYC, et al | SETTLED WITHOUT SUIT FILED | settled $12,500 |
| | | |

144.    Some of these open Occupy Wall Street cases are (information last updated on March 9, 2016):

| Case | Index |
| --- | --- |
| Allen v. NYC, et al | 15-cv-01918 (PKC)(MHD) |
| Arbuckle v. NYC, et al | 13-CV-10248 (ER) |
| Bogart v. NYC, et al | 13-CV-1017 (NRB) |
| Brown v. NYC, et al | 13-CV-1018 (KAF) |
| Caravahlo et al v. NYC, et al | 13-CV-04174 (PKC)(MHD) |
| Case et al v v. NYC, et al | 14-CV-09148 (AT) |
| Collins et al v. NYC, et al | 14-CV-08815 (AJN) |
| Dekuyper v. NYC, et al | 14-CV-08249 (DLC) |
| Douglas v. NYC, et al | 14-CV-08124 (ALC)(AJP) |
| Faraone v. NYC, et al | 13-CV-9074 (DLC) |
| Gersbacher v. NYC, et al | 14-CV-07600 (GHW) |
| Gonzalez v. NYC, et al | 14-CV-07721 (LGS) |
| Higginbotham v. NYC, et al | 14-CV-08549 (PKC) |
| Holmes v. NYC, et al | 14-CV-05253) (LTS(RLE) |
| Kass v. NYC, et al | 14-CV-0705 (ALC)(GWG) |
| Marlin v. NYC, et al | 15-CV-2235 (CM) |

| | |
|---|---|
| Marom v. NYC, et al | 15-CV-02017(PKC)(MHD) |
| Martinez v. NYC, et al | 14-CV-08686 (KPF) |
| McMIllan v. NYC, et al | 15-CV-01962 (JMF) |
| Mediavilla v. NYC, et al | 14-CV-8624 (VSB) |
| Meyers et al v. NYC, et al | 14-CV-09142 (ALC) |
| Packard v. NYC, et al | 15-CV-7130 (AT)(RLE) |
| Pesola v. NYC, et al | 15-CV-01917 (PKC)(MHD) |
| Phoebe Berg. et al v. NYC, et al | 12-CV-3391 (TPG) |
| Pluma v. NYC, et al | 13-CV-2017 (TPG) |
| Richardson v. NYC, et al | 15-CV-5775 (PKC) |
| Rodriguez et al. v. WInski, et al | 12-CV-3391 (TPG) |
| Soto v. NYC, et al | 13-CV-08474-LTS-JLC |
| Tardif v. NYC, et al | 13-CV-4056 (LTS) |
| Vincent v. Winski, et al. | 14-CV-7744 (VSB) |
| Wiles v. v. NYC, et al | 13-CV-2898 (HB) |

145.    As a result of the foregoing, Plaintiff was deprived of his liberty and property, experienced injury, pain and suffering, emotional injury, costs and expenses, and was damaged and injured.

146.    As a result of the Defendant POLICE OFFICERS ' impermissible conduct, the Plaintiff demands judgment against the Defendant POLICE OFFICERS in an amount to be determined at trial, along with punitive damages, together with attorney's fees and costs.

<u>FOURTH CLAIM FOR RELIEF</u>

<u>FALSE ARREST</u>

147.    Plaintiff repeats, reiterates, and re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

148.     Plaintiff was arrested by the Defendant POLICE OFFICERS without probable cause, without a warrant, and without the Plaintiff's consent.

149.     As a result of the above constitutionally impermissible conduct, Plaintiff was caused to suffer personal injuries, violation of his civil rights, loss of liberty, and other special damages.

150.     As a result of the Defendant POLICE OFFICERS' impermissible conduct, the Plaintiff demands judgment against the Defendant POLICE OFFICERS in an amount to be determined at trial, along with punitive damages, together with attorney's fees and costs.

<u>FIFTH CLAIM FOR RELIEF</u>

<u>FAILURE TO INTERVENE</u>

151.     Plaintiff repeats, reiterates and re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

152.     The Defendants NYPD PO IVAN BAUTISTA, NYPD PO OFFICER DANIEL CROSS,  and JOHN DOE NYPD AFRICAN-AMERICAN SERGEANT, had an affirmative duty to intervene on Plaintiff's behalf to prevent the violation of his constitutional rights.

153.        As alleged above, the Defendants NYPD PO IVAN BAUTISTA, NYPD PO OFFICER DANIEL CROSS,  and JOHN DOE NYPD AFRICAN-AMERICAN SERGEANT, chose not to intervene on Plaintiff 's behalf to prevent the violation of his constitutional rights despite having had realistic opportunities to do so.

154.        The Defendants NYPD PO IVAN BAUTISTA, NYPD PO OFFICER DANIEL CROSS, and JOHN DOE NYPD AFRICAN-AMERICAN

SERGEANT, chose not to intervene on Plaintiff's behalf to prevent the violation of his constitutional rights despite having substantially contributed to the circumstances within which Plaintiff's rights were violated by their affirmative conduct.

155.     As a result of the aforementioned conduct of the Defendants NYPD PO IVAN BAUTISTA, NYPD PO OFFICER DANIEL CROSS,  and JOHN DOE NYPD AFRICAN-AMERICAN SERGEANT, Plaintiff's constitutional rights were violated.

156.     As a result of the above constitutionally impermissible conduct, Plaintiff was caused to suffer personal injuries, violation of his civil rights, loss of liberty, and other special damages.

157.     As a result of the Defendants NYPD PO IVAN BAUTISTA, NYPD PO OFFICER DANIEL CROSS,  and JOHN DOE NYPD AFRICAN-AMERICAN SERGEANT, POLICE OFFICERS' impermissible conduct, the Plaintiff demands judgment against the Defendant POLICE OFFICERS in an amount to be determined at trial, along with punitive damages, together with attorney's fees and costs.


SIXTH CLAIM FOR RELIEF

FIRST AMENDMENT

158.     Plaintiff repeats, reiterates, and re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

159.     In detaining, assaulting and arresting Plaintiff, in prosecuting Plaintiff, and in implementing In detaining, assaulting, and arresting Plaintiff, in prosecuting Plaintiff, and in implementing, enforcing, encouraging, sanctioning, and/or ratifying policies,

practices, and/or customs punishing peaceful protest, defendants violated Plaintiff's rights to speak, assemble, associate, and petition the government for redress of grievances peaceably.

160.    Defendants engaged in the acts and omissions complained of herein with ill will and/or actual malice.

161.    Defendants engaged in the acts and omissions complained of herein in retaliation for Plaintiff's protected conduct and/or speech.

162.    Defendants engaged in the acts and omissions complained of herein in order to prevent Plaintiff from continuing to engage in protected conduct.

163.    Defendants engaged in the acts and omissions complained of herein in order to prevent and/or discourage Plaintiff from engaging in similar protected conduct in the future, including throughout September 17, 2012.

164.    The Plaintiff was actually chilled in that the Plaintiff was prevented and /or deterred from participating in protected conduct on the date of, and on numerous dates after, the incident as a result of defendants' violations of their rights as complained of herein.

165.    As a result of the foregoing, Plaintiff was deprived of his liberty and property and First Amendment and other constitutional rights, suffered bodily injury, pain and suffering, psychological and emotional injury, humiliation, costs and expenses, and was otherwise damaged and injured, and defendants chilled and created the risk of chilling conduct protected by the First Amendment.

WHEREFORE and in light of the foregoing, it is respectfully requested that the Court assume jurisdiction and:

[a] Invoke pendent party and pendent claim jurisdiction.
[b] Award appropriate compensatory and punitive damages.
[c] Empanel a jury.
[d] Award attorney's fees and costs.
[e] Award such other and further relief as the Court deems to be in the interest of justice.

DATED:        New York, New York
              March 11, 2016

                        Respectfully submitted,


                        _____//s//_____
                        Wylie M. Stecklow
                        STECKLOW & THOMPSON
                        ATTORNEYS FOR PLAINTIFF
                        217 Centre Street, 6th Floor
                        New York, New York 10013
                        Phone:        (212) 566-8000
                        Fax:          (212) 202-4952
                        Wylie@SCTLAW.NYC