```
               UNITED STATES DISTRICT COURT
             SOUTHERN DISTRICT OF NEW YORK

In re:                            :
                                       Docket #15cv7280
 GERSKOVICH,                      : 1:15-cv-07280-RMB-DCF

               Plaintiff,         :

       - against -                :

 IOCCO, et al.,                   :
                                       New York, New York
                  Defendants.     : August 3, 2016

-----------------------------------:

                  PROCEEDINGS BEFORE
            THE HONORABLE DEBRA C. FREEMAN
        UNITED STATES DISTRICT COURT MAGISTRATE JUDGE


APPEARANCES:

For Plaintiff:          STECKLOW COHEN & THOMPSON
                        BY:  WYLIE M. STECKLOW, ESQ.
                        217 Centre Street, 6th Floor
                        New York, New York 10013

For Non-Party          JEFFREY ROTHMAN, ESQ.
Marisa Holmes:         315 Broadway, Suite 200
                       New York, New York 10007

For Defendants:        NEW YORK CITY LAW DEPARTMENT
                       OFFICE OF CORPORATION COUNSEL
                       BY:  ANDREW LUCAS, ESQ.
                            LAMAR WINSLOW, ESQ.
                       100 Church Street
                       New York, New York 10007



Transcription Service: Carole Ludwig, *Transcription Services*
                       141 East Third Street #3E
                       New York, New York 10009
                       Phone:  (212) 420-0771
                       Fax:  (212) 420-6007

Proceedings recorded by electronic sound recording;
Transcript produced by transcription service.
```

<u>INDEX</u>

### <u>E X A M I N A T I O N S</u>

| Witness | Direct | Cross | Re-Direct | Re-Cross | Court |
|---------|--------|-------|-----------|----------|-------|
| None | | | | | |

### <u>E X H I B I T S</u>

| Exhibit Number | Description | ID | In | Voir Dire |
|----------------|-------------|----|----|-----------|
| None | | | | |

1

```
 1                                                    3
 2           THE COURT:  Hi, it's Judge Freeman, who do I have
 3  Mr. Gerskovich?
 4           MR. WYLIE STECKLOW:  Wylie Stecklow, Your Honor,
 5  good afternoon.
 6           THE COURT:  Okay, and who do I have for
 7  defendants?
 8           MR. ANDREW LUCAS:  Andrew Lucas and Lamar Winslow,
 9  good afternoon, Your Honor.
10           THE COURT:  Okay, and do I also have counsel for
11  Ms. Holmes.
12           MR. JEFFREY ROTHMAN:  Yes, Your Honor, Jeffrey
13  Rothman for Ms. Holmes, good afternoon.
14           THE COURT:  Okay, good afternoon.  Okay, so I have
15  two motions in front of me in the Gerskovich case.  Mr.
16  Rothman, I don't now if you know anything about the second
17  one.  One is a motion to quash the subpoena for Ms. Holmes,
18  I guess you could say documents, so it's a video and
19  testimony. The other is a motion to compel compliance with
20  another subpoena that was served on an entity called --
21           MR. ROTHMAN:  Yes, Your Honor, I've read because I
22  am now, I had to list Ms. Holmes on the docket as a nonparty
23  so I received by ECF Mr. Lucas' letter motion seeking to
24  compel the Occupy Wall Street Media Group and I read his
25  letter and the attachments to his letter so I'm familiar
```

4

1

2  with that.

3          THE COURT:  Okay, are you going to be involved

4  with that one in any way?

5          MR. ROTHMAN:  I will not be representing the

6  Occupy Wall Street Media Group as far as I can anticipate. I

7  believe in the very near future another lawyer will be

8  entering an appearance and writing Your Honor with regard to

9  that so that is still a work in progress.

10          THE COURT:  Okay, my concern was whether there was

11  actual notice because I saw there was an affidavit that said

12  there was attempted service on the entity in New York and

13  then there was service to the Secretary of State and I

14  wanted to make sure before I did anything on that that I was

15  confident that there was actual notice. And so I'll give it

16  a short while to see if somebody appears and has a response

17  to that. Let me then turn my attention to the subpoena for

18  Ms. Holmes.  I understand the arguments that are being made

19  on both sides, and my sense of the best way to handle this,

20  and before I just issue a ruling I wanted to put it out

21  there as a, so the statement of what my inclination was and

22  see if anyone wanted to respond before I'd go ahead and

23  issue this order.

24          My inclination would be to let an extremely short

25  deposition go forward. I'm actually thinking one hour

1

2  because it seems to me she's already indicated she doesn't

3  have any video and Mr. Lucas has indicated a desire to probe

4  that, it seems to me he can say this is you in this photo

5  with this video camera, right, you took video, what happened

6  to it, what did you do to search for it, what else did you

7  do to search for it, you know, and I can't see why that

8  can't be accomplished in less than an hour's time.

9          So I also would be inclined to deny the request

10  for sanctions on the ground, requested on the ground of

11  harassment and just say that, look, expecting everybody to

12  be on their best behavior with respect to this short

13  deposition and if there is any indication on the record that

14  there is anything abusive or harassing then you can come

15  back, show me the transcript, I will look at it, I would

16  expect to see, you know, a squeaky clean looking transcript

17  with respect to everybody's demeanor, the nature of the

18  questioning and so on and if I see something that really

19  looks like it's harassing conduct than you can renew an

20  application for sanctions.

21          But at this point there is an old photo that

22  clearly shows, what appears to clearly show Ms. Holmes with

23  a nice looking video camera in her hands on the location,

24  what happened at this location is at issue in the case,

25  there may be other video but it hasn't, as far as I

1

2  understand, shown a couple of things definitively. One,

3  whether Mr. Gerskovich was inside; second, there's an issue

4  as I understand it as to whether there were announcements

5  made to disperse from the outside of the building and who

6  knows exactly what she had or where she was and what she

7  might as captured. As I said, it seems relevant and what I'm

8  thinking is something, you know, extremely short and to the

9  point so that she's under oath and it's pinned down, out to

10 be the resolution here. So I throw it open for your thoughts

11 before I rule that way.

12       MR. ROTHMAN:  Your Honor, I appreciate that, but

13 the timing aspect is not so much the issue, whether it's one

14 hour or three hours, or if it's a problem that it's

15 occurring at all.  As I put in the letter, Ms. Holmes is a

16 professional journalist, and she is protected by the

17 qualified journalist privilege. She also has said explicitly

18 she has nothing, Mr. Lucas knew that from her Facebook chats

19 with Mr. Gerskovich.  She said, you know, she looked, she

20 doesn't have anything, I reiterated that in my letter. And

21 to permit Mr. Lucas to ask a professional journalist, you

22 know, how she keeps her material, where it is and to probe

23 in that way, would be contrary to exactly what the

24 journalist --

25       THE COURT:  Well I don't know --

1

2          MR. ROTHMAN:  (continuing) -- is supposed to

3    protect.

4          THE COURT:  By the way, I forgot to say so, I

5    haven't had you on the phone on this call before so let me

6    just say that we do have digital recording for this

7    conference so we can be on the record, and if anyone wants a

8    transcript it's possible to obtain it as an electronic court

9    recording.

10         With respect to that, you know, the journalistic

11   privileges, number one, is not absolute.  Number two, there

12   is nothing at this point requiring her to turn over

13   materials she says she doesn't have and can't find.

14   Certainly if she has it and can find it you can engage in

15   further discussion as to whether, in fact, it should be

16   produced, but right now the inquiry is whether it even

17   exists. I don't know that the journalistic privilege extends

18   to, you know, what happened to your journalistic material.

19   What we have are Facebook or email type communications

20   saying, you know, I don't have it, I looked, I don't have

21   it. That's not very precise, yet you are relying on it.

22         MR. ROTHMAN:  I've checked, I'm sorry to

23   interrupt, after that I've checked, I said I'm going to be

24   responding to a subpoena that's been issued in federal court

25   and I want you to check again and she checked. And there is,

1

2  there are no materials about this.

3          THE COURT:  Well did you, yourself, get involved

4  in understanding what the nature of the search was and what

5  she had done or not done in order to check or did you just

6  say go check?

7          MR. ROTHMAN:  No, did, I got a specific

8  understanding of what she did, I'll represent briefly that,

9  you know, she had no materials at all from that day, she

10  doesn't have any materials at all relating to that day.

11          THE COURT:  Well what makes you think that a

12  journalist, like an investigative type privilege or

13  something, would be at issue by having her testify about,

14  you know, what she looked, how she looked, just to confirm

15  due diligence, since we do know that she was there with a

16  video camera?

17          MR. ROTHMAN:  The video camera, that's the

18  Gonzalez case that I cited, the reason why the journalist

19  was required to turn over the materials in that case was

20  because there were specific conversations that were captured

21  on that that went right to the heart of the issue in the

22  case, it wasn't just that the person was there. In order to

23  overcome the qualified journalist privilege, it has to be

24  shown that materials not otherwise available elsewhere are

25  available to the journalist.  So Ms. Holmes does not deny

1

2  she was there, she was there, she was filming as she did all

3  the time throughout Occupy Wall Street and otherwise. But

4  what, if any, of her materials could be found, which they

5  cannot, what would be captured on them is available to any

6  number of other sources. It's available through all of the

7  eyewitnesses, through other video that has apparently been

8  exchanged in the case.  There is nothing special about any

9  of her video. And I do posit that having a journalist come

10 in and --

11       THE COURT:  But you didn't really answer my

12 question which is what is it about, you know, investigative

13 privilege or journalistic privilege, what is it that is

14 sensitive with respect to the nature of the search that was

15 made for video that at one point apparently existed and

16 that, you know, in the Court's view would be relevant to

17 central issues in a case? Forget for a moment whether there

18 is other video that would equally show what's being looked

19 for here or whether there's testimony that in your view

20 could suffice for that, my question is what is sensitive,

21 what is protectable with respect to the inquiry that I'm

22 envisioning which would be, you know, what did you do to

23 look for the video that once existed?

24       MR. ROTHMAN:  The way in which she does or does

25 not keep her files, her journalistic files, is private.

THE COURT:  Do you have any authority that that would be covered by journalistic privilege?

MR. ROTHMAN:  If Your Honor will permit me I will submit a reply and --

THE COURT:  I'll look at that. I will certainly look at that. I mean it may be that the qualified privilege would need to bend anyway.  But I'm not familiar what, I'm always happy to look, that talks about privilege protecting what someone did to look for journalistic material and how a diligent search was made. This is not a situation where there's a question as to whether video was taken in the first instance, it apparently was, I don't think anyone is denying that.  So the only question is what happened to it and the only question here that I'm seeing right now is whether the City has to rely on informal representations of what was done to find it as opposed to pressing that question of what did you do to look for it.  It seems to me that's all we're talking about right now.  Let me ask Mr. Lucas, is that right, is that all we're talking about, what did you do to look for it?

MR. LUCAS:  That is certainly the focus of it, Your Honor. In terms of the scope of the deposition, so I certainly don't want to take a long deposition by any means. Given that she was also present and a fact witness, I would

1

2   want some leeway to actually ask her if she did see or here

3   and what she did leading up to and through that event since

4   it is relevant.  But yes, the focus really would be that

5   video, and the media that she might have had pass through

6   her hands about it.

7            THE COURT:  If you wanted to ask her did you see

8   Mr. Gerskovich, if so did you see him inside or outside the

9   building, and, you know, if there is some other, you know,

10  main issue in the case like did you hear any announcements

11  outside while you were outside, did you hear announcements

12  outside, I mean I don't have a huge problem with that.  But

13  I'm still thinking what you've got to ask her is, you know,

14  I could ask the questions right now in probably three

15  minutes or less. So it may be that her answers require a

16  little bit of follow-up, but there isn't a whole lot here to

17  ask this person, she's not, you know, she's, you've got

18  plenty of witnesses, you already know the tail, you might

19  have a few more questions, I don't really have a huge

20  problem with somebody who was present at an event and might

21  have seen or heard something particularly relevant here. But

22  I'm still thinking this is a relatively short affair if it

23  goes forward, and what was presented to me was, you know, we

24  want the video, we're subpoenaing the video and if we can't

25  find it we want to ask her more about it.  I don't think it

1
2  was presented, I can go back and look at your letter, I
3  don't think it was presented as in we also want to ask her
4  about whatever she saw, heard, observed, knew about what
5  happened that day as a fact witness.
6          MR. LUCAS:  Well certainly that would have been
7  the focus of our, not the focus, but that would have been
8  part of our deposition that was subpoenaed to take place
9  back on the 22nd, it would have been a relatively minor part
10 because as with, the very basis of the journalist privilege
11 was breached in or the qualified privilege was overcome in
12 Gonzalez is exactly what we're looking for here, and what
13 Mr. Stecklow has been looking for when he's trying to get
14 the exact wording through various requests on us of the
15 (inaudible) which is the objective media. That's certainly
16 our preference if we can obtain it.
17         THE COURT:  All right, let's do this.  Let's do
18 this.  I will hold off on making this ruling long enough to
19 enable Mr. Rothman to submit something that explains why
20 they questions of, you know, explain what the diligent
21 search was that you made, just explain, you know, where you
22 looked and how you looked, where did you keep things and,
23 you know what makes you think you might have taped over
24 something, those sorts of basic questions about the nature
25 of the search under oath. I'll let you provide some case law

13

1

2  to me on, you know, journalistic privilege and how you think

3  that applies. There's still the question of whether

4  journalistic privilege can be overcome.  You know, there may

5  be other, but there's already some video and it doesn't

6  answer all the questions. So testimony is disputed.  There

7  may be other video that other people took, but I've been

8  shown a picture of her front and center with a video camera.

9  So we do know --

10        MR. ROTHMAN:  That was never disputed, Your Honor.

11        THE COURT:  Yeah, we do know that she was there

12  and she took video. So, you know, I'm inclined to think

13  journalistic privilege may be overcome but right now it

14  seems to me the only question is what was that search that

15  there can be confidence, what seems to me that she is like

16  to do is she is like to do is she is likely to say, you

17  know, I sometimes store things electronically, I sometimes

18  store things just like in a computer, sometimes I store

19  things just on a disk, sometimes I don't keep them. I went

20  back, I looked at my computer, I looked at my disk, I looked

21  at the different accounts that I have where I keep things, I

22  didn't find it anywhere. You know, it's not anywhere, I'm

23  sorry, and that's the end of it.

24        MR. ROTHMAN:  Can I make a proposal that might

25  save everybody some time?

                                                                    14

2          THE COURT:  Sure.

3          MR. ROTHMAN:  As long as it's not construed as

4   being any sort of a waiver, I will have her submit a

5   declaration as to how she searched and provide that to Mr.

6   Lucas and in camera to the Court, you know, I don't want it

7   filed online, on ECF, but that might satisfy everybody.

8          THE COURT:  Well, Mr. Lucas, would you take a

9   declaration under penalty of perjury as to what she did to

10  look for the video?

11         MR. LUCAS:  Well, I mean, Your Honor, I'm

12  certainly happy to have a look, but at the same time I think

13  a chat conversation over Facebook, and, of course, Mr.

14  Rothman is representing here that he did ask her to do some

15  different search --

16         THE COURT:  No, he asked her, he asked her -- what

17  I am hearing is that counsel, as counsel, can represent to

18  the Court that he took his responsibilities to make sure his

19  client had engaged in a diligent search and he's satisfied

20  that obligation as counsel, and he is persuaded the search

21  was diligent, that's what I'm hearing.

22         MR. ROTHMAN:  Exactly correct.

23         THE COURT:  Okay.  Ordinarily that, you know, that

24  could be the end of things, so, you know, my feeling is

25  right now there is at least reason to believe that video did

1

2   at one point exist and I'm willing to let counsel get a

3   little more information about it to be satisfied that it was

4   diligent.  At least you have a step beyond, you have a

5   statement by counsel on the record a step beyond what you

6   had before which were Facebook posts or chats, or email, I

7   can't remember exactly what you had.  You know, maybe what

8   you do is you provide a declaration on this point to Mr.

9   Lucas, you don't even bother providing a copy to the Court,

10  and --

11          MR. ROTHMAN:  To or not to provide a copy to the

12  Court, I didn't hear you, Judge, I'm sorry?

13          THE COURT:  Maybe you don't even need to provide a

14  copy to the Court if that resolves it as between counsel.  I

15  mean, look, there seems to be some ill will between counsel

16  with respect to how this other case that's not in front of

17  me has been litigated. I don't really want to know how

18  another case has been litigated, I care about the case in

19  front of me, and I expect, you know, good faith cooperation

20  between counsel to try to work out issues, if possible,

21  without the Court's involvement.  Maybe you can work this

22  out without my involvement.

23          MR. ROTHMAN:  Okay, as long as it's not considered

24  to be, and Mr. Lucas states that a provision of this

25  declaration is not going to be deemed to be any sort of a

```
 1                                                        16
 2   waiver of her qualified journalistic privilege, then I will
 3   --
 4            THE COURT:  Well you have to talk about that. I'll
 5   tell you what, talk offline, see if you can agree to a
 6   compromise solution. If you can't agree to a compromise
 7   solution, you know, get me a submission by Monday, today is
 8   Wednesday.
 9            MR. ROTHMAN:  Your Honor, I'm leaving for Hawaii
10   on Saturday and I'll be gone for four weeks. I'm happy to
11   work on this from there but if Your Honor would give me a
12   little more time?
13            THE COURT:  I was going to say by Friday before
14   you leave.
15            MR. LUCAS:  Unless counsel wants a substitute, I
16   can go to Hawaii for you.
17            MR. ROTHMAN:  Generous offer.
18            THE COURT:  There you go, good will between
19   counsel.  Look, four weeks is not really going to work so
20   well --
21            MR. ROTHMAN:  No, no, no, I can work on it from
22   there, I just, I'm flying on Saturday, it's a 10 or so hour
23   flight, I won't get in till Sunday, if I could have until
24   the end of next week I can work on it from --
25            THE COURT:  Okay, if you cannot work out a
```

1

2  compromise on this, you know, maybe it is an agreement by

3  defendant that it won't leave journalistic privilege and

4  maybe plaintiff agrees to provide a declaration under

5  penalty of perjury as to what the search consisted of, and

6  how there is nothing. If there really is nothing, I think

7  the minimal added value of what she may have heard or seen

8  when you have other witnesses, you know, who are, I assume

9  have already been deposed or can be deposed, you've got

10  parties -- I'm sorry?

11          MR. LUCAS:  Sorry, Your Honor, this is Andrew

12  Lucas, we actually have requested, and we don't actually

13  have contact information for a lot of the other witnesses so

14  we don't really have a lot of other witnesses we could

15  depose --

16          THE COURT:  Well if it were not for this video I

17  don't get the sense that you would have been seeking this

18  (inaudible) as a fact witness. I got the impression that

19  what you were after was the video.  Am I wrong that that was

20  the thrust of what you were telling me? I mean this was not

21  as in we want to depose this person as a fact witness and

22  while we're at it we'll ask about what happened to video. I

23  got the impression we wanted this video, we don't trust it,

24  we want to make sure we want to know what happened, we

25  really need video, she was the person there with the camera,

1

2   look at this, you see, here she is with the camera. And

3   that, I mean the fact is we don't, you know, she says she

4   doesn't have it, we're going to try this other organization,

5   maybe they have it, we want, we want, we want the video.

6   So, you know, that's how it was presented to me, that's what

7   I understood the thrust of this was. It seems to me this

8   idea of we also want her fact testimony is a little bit of a

9   belated thought.

10          MR. LUCAS:  Certainly, Your Honor, to paraphrase

11  your own words, this was a witness who we said we really

12  want a vide and while we're at it, she is a fact witness.

13  And I think just as clearly as she was taking video, she is

14  a fact witness.

15          MR. ROTHMAN:  Your Honor, I'll note, this is Jeff

16  Rothman speaking for the recording, there was originally

17  another subpoena that had been sent to me that defendants

18  intended on serving that had only a documentary aspect and

19  did not have any testimonial aspect to it at all. It was

20  only after that subpoena apparently was not able to be

21  served that this new subpoena that I'm presently moving to

22  quash was taped to Ms. Holmes' door. But it was so much of

23  an afterthought that the original subpoena didn't even ask

24  her to come in for a deposition --

25          THE COURT:  Let me say something else. You know,

1

2  there is another lawsuit going, Ms. Holmes is a plaintiff,

3  you know, is a plaintiff in another lawsuit. There is

4  discovery going on there.  It seems to me that there is

5  potentially a harassing element to this and I'd like to

6  avoid any suggestion of that. I'm focusing on the video. You

7  know, if she is deposed ultimately with respect to the

8  video, I'll allow a little bit further questioning about

9  what she observed, what she saw, what she heard, again, I

10 would expect it to be very short.

11        If there really is, you know, competent evidence,

12 a declaration under penalty of perjury, it would seem

13 satisfactory to put to bed the question of whether there is

14 video, and it really appears that there is not and there is

15 not really that kind of basis for the deposition, I would be

16 inclined not to have her deposed at all on other topics that

17 didn't seem to be a major thrust, it didn't seem to me why

18 defendant was seeking it in the first place. I think it's a

19 little bit after the fact as a further rationale for why,

20 you know, more time is needed or more questioning would be

21 needed than what I was picturing.

22        Let's see if we can get to the bottom of the

23 question about, you know, how she searched for the video.

24 Maybe a declaration would work, but if a declaration does

25 not work either because there is an unwillingness to waive

1
2  that privilege and she doesn't want to take the risk, or,

3  I'm sorry, unwillingness to consider that there is no waiver

4  of privilege and Ms. Holmes doesn't want to take that

5  chance, or because you're otherwise not willing to agree to

6  that approach, then I'll look for a letter from Mr. Rothman

7  by the end of next week explaining why you believe that the

8  type of questioning that I am envisioning as being the

9  primary purpose of this deposition, specifically, you know,

10 what did you do to look for a particular piece of

11 journalistic evidence, what did you do with it, you know,

12 what sort of effort did you make to find it, why that,

13 itself, would be covered by privilege and, you know, a

14 privilege significant enough that it should not be

15 considered overcome in this case.  All right?

16          MR. ROTHMAN:  Understood, Your Honor, thank you.

17          THE COURT:  Got all that?

18          MR. ROTHMAN:  Indeed?

19          MR. LUCAS:  Your Honor, this is Andrew Lucas.

20          THE COURT:  Yes.

21          MR. LUCAS:  I briefly wanted to note, and I think

22 it was clear enough from our papers, we don't recognize the

23 assertion of privilege as proper.  So to the extent we do

24 grant any waiver of privilege --

25          THE COURT:  Well if you --

MR. LUCAS:  On the other hand, we, of course,

don't want that to be taken as a recognition that there is a

properly --

THE COURT:  Well you can stipulate. I mean you can

try to stipulate, I can't force anybody to stipulate.  But

you can try to stipulate that the fact that she's providing

this affidavit and that you're agreeing to accept it and

move at a deposition would neither constitute a waiver of

privilege by her nor a recognition of privilege or

applicability of privilege by defendant. It's sort of like

no admission or liability, no this, no that, it's just done

for the sake of resolving a dispute. You can see if you can

do that.

MR. LUCAS:  There was a second point I wanted to

raise if I could?

THE COURT:  Go ahead.

MR. LUCAS:  Which was just I'm having, I'm really

struggling with something you noted a minute ago where you

said you think that there could be an element of harassment

when, in fact, we have the photographic, I mean undisputed

and indisputable proof that this person was there, present

and recording and it's particularly surprising, given the

very wide latitude that's been given to plaintiff in taking

discovery at several times in this case. We have an

eyewitness who has boots on the ground taking undisputed

evidence and I just had to hear that --

THE COURT:  Well here's my concern, here's my

concern, my concern, number one, is that this plaintiff, I'm

sorry, this nonparty to this case has her own lawsuit going

where apparently there's been some run-ins between counsel

at least, to which I have not been privy and I'm hoping it's

not much, but nonetheless, there is a separate lawsuit

going, it's apparently being vigorously litigated.

Number two, the presentation I had was, you know,

about the video and there seems to be a bit of a shift in

attention about how she was a witness, and you tried to get

other witnesses, and you needed a witness and that was not

in what was presented to me. So it seemed like maybe it was

a shift to try to do this even if the other issues are

resolved.

Number three, there were statements by her that

seemed to indicate pretty clearly that she couldn't find the

evidence and it seemed to me the next thing that should have

happened once counsel surfaced, and, of course, you already

knew who counsel was in the other case, is to have a

conversation and say, look, there's a subpoena, can you

represent to us that, as counsel, that you're satisfied with

the diligence of the search and that you really are

 1

 2  confident it doesn't exist, you know, instead of pressing

 3  forward with this.  Nonetheless, it's in front of me, it is

 4  what it is, I recognize potential relevance of the evidence,

 5  I recognize that she was there and that she apparently

 6  conceded she took video at the time, and I'm willing to

 7  consider the possibility that journalistic privilege, to the

 8  extent it exists, may be overcome in these circumstances and

 9  that maybe it should be produced if it does exist. And that

10  maybe defendants should be able to probe a little bit to

11  have confidence as to what happened to it.  But there are

12  several indications here that, you know, this is a, sort of

13  an aggressive effort by defendant's counsel to push on

14  something where there may not be anything to push on and

15  you've got a person you're pushing on who happens to be a

16  plaintiff in another case. That doesn't necessarily mean

17  it's harassment, it may just be that she happened to be a

18  witness there who happened to take video. And I don't want

19  to suggest it's more than that, but I'm a little bit

20  concerned that it not turn into something more than what was

21  presented and that it, you know, it be sort of kept under

22  control.

23          So, you know, I don't mean to cast discursions, I

24  just do think that, you know, let's be a little bit

25  conscious of the fact that she is a plaintiff in her own

1

2   case, the things she says in this case could potentially be

3   used in another case, that there's a little bit of wariness

4   by that, that we have common counsel. So let's be sensitive

5   to it as we're trying to make a balanced, reasonable

6   determination as to how much she should become a witness in

7   this case.

8          MR. LUCAS:  It sounds like that makes sense, of

9   course we tried to make it a very focused and very limited

10  subpoena, her testimony would have been the same way, and,

11  of course, if we actually were seeking her deposition for

12  this evidence to be used in another case, that would be

13  improper.

14         THE COURT:  Okay.  Let's just leave it without

15  discursions cast on anybody and let's see if counsel can

16  work together cooperatively to resolve this without need to

17  pursue the subpoena further. Let me know by the end of next

18  week if defense counsel wants to reply to anything that is

19  submitted by Ms. Holmes' counsel, I'll allow that, make sure

20  you do it in a day or two at the most because I'd like to

21  get this resolved. And with respect to the other subpoena,

22  you know, I'll wait until next week anyway and see if I get

23  something, but if you have, Mr. Rothman, if you have

24  contact, the ability to be in contact directly or indirectly

25  with the other lawyer who supposedly is going to appear,

25

1

2  make sure the message gets passed along that I'm not going

3  to wait forever.

4          MR. ROTHMAN:  Very good.  Would you like me to

5  communicate a firm deadline?

6          THE COURT:  How about by, well if someone is going

7  to get me something, how about by middle of next week?

8          MR. ROTHMAN:  Okay.

9          THE COURT:  Okay, a week from today?

10          MR. ROTHMAN:  Okay, the 10th, that's fine.

11          THE COURT:  Okay?

12          MR. ROTHMAN:  Thank you so much.

13          THE COURT:  Thank you all.

14          MR. ROTHMAN:  Have a good evening.

15          MR. LUCAS:  Thank you, Your Honor.

16          THE COURT:  All right, you're welcome, take care,

17  everybody.  Bye.

18               (Whereupon the matter is adjourned.)

19

20

21

22

23

24

25

26

C E R T I F I C A T E

      I, Carole Ludwig, certify that the foregoing transcript of proceedings in the United States District Court, Southern District of New York, Gerskovich v. Iocco, et al., Docket #15cv7280, was prepared using PC-based transcription software and is a true and accurate record of the proceedings.

Signature_____

Date:  August 9, 2016