**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 7/17/17
```

-----------------------------------------------------------X

ALEX GERSKOVICH,                    :

           Plaintiff,       :

      - against -                :

NYPD CAPTAIN MARK IOCCO, THE CITY    :
OF NEW YORK, a municipal entity, NYPD :
DEPUTY CHIEF STEVEN ANGER,           :

           Defendants.      :

-----------------------------------------------------------X

**DECISION & ORDER**

15 Civ. 7280 (RMB)

## I.    Background

This case centers around the arrest of Plaintiff Alex Gershkovich[1] at or near 4 New York Plaza where a protest demonstration against JP Morgan Chase was taking place inside the lobby (of 4 New York Plaza). (Pl.'s 56.1 Stmt., filed Mar. 3, 2017, ¶ 15.) The arrest occurred on September 17, 2012, the one-year anniversary of the Occupy Wall Street movement. (Id. ¶ 1.) Plaintiff was filming and photographing the demonstration. (Id. ¶¶ 88-90.) He was arrested outside of the lobby of 4 New York Plaza, which the parties agree is **"privately owned public space."** (Id. ¶ 89 (emphasis added); Joint Letter from Parties to U.S. Magistrate Judge Debra C. Freeman, dated Sept. 30, 2016, at 1.)

The Court, having reviewed **(i)** Defendants' memorandum of law, dated January 26, 2017, in support of their motion for summary judgment, including their Local Rule 56.1 Statement, contending that "there was probable cause to arrest [P]laintiff for trespass" and disorderly conduct (Defs.' Br. at 4)**; (ii)** Plaintiff's memorandum of law, dated March 3, 2017, in opposition to Defendants' motion and in support of Plaintiff's cross-motion for partial summary

---

[1] Plaintiff's name is misspelled in the caption of the case.

judgment, including his Local Rule 56.1 Statement, arguing that "probable cause was lacking for [Plaintiff's] arrest" (Pl.'s Br. at 2)**; (iii)** Defendants' reply memorandum of law, dated March 17, 2017**; (iv)** the record herein**;** and the Court having heard helpful oral argument on July 13, 2017 (see H'rg Tr., dated July 13, 2017), **hereby denies both Defendants' motion [#139] and Plaintiff's cross-motion [#152].**[2]

Defendant NYPD Captain Mark Iocco arrested Plaintiff on September 17, 2012 for trespass and disorderly conduct. (Pl.'s 56.1 ¶ 80.) Following his arrest, Plaintiff was held in custody for approximately 36 hours. (Korenbaum Decl., filed Mar. 3, 2017, Ex. 17.) On September 18, 2012, Plaintiff was arraigned (Korenbaum Decl., filed Mar. 3, 2017, Ex. 1), and on November 13, 2012, the case against Plaintiff was "adjourned in contemplation of dismissal," pursuant to New York Criminal Procedure Law § 170.55. On May 10, 2013, Plaintiff's case was dismissed. (Id., Ex. 18.)

On January 25, 2017, the Court so-ordered the parties' joint stipulation to dismiss Plaintiff's claims of excessive force, unlawful search, failure to intervene, false imprisonment, and malicious prosecution, which left the following claims to be resolved: "1) False Arrest against defendants Iocco and [NYPD Deputy Chief Steven] Anger; 2) deprivation of fair trial against Iocco; 3) First Amendment claims against Iocco and Anger; and 4) municipal liability against the City of New York." (Stipulation, filed Jan. 25, 2017, ¶ 2.)

## II. Legal Standard

"A district court may not grant summary judgment if there exists a genuine issue of material fact." Jenkins v. City of N.Y., 478 F.3d 76, 89 (2d Cir. 2007). "The weighing of the

---

[2] The Court is not here ruling upon the ultimate merits of either party's claims. See Miller Bros. Hat Co. v. Adam Mgmt. Corp., 170 F. Supp. 510, 511 (S.D.N.Y. 1959) ("The issue on a motion for summary judgment is not the ultimate issue . . . .").

evidence and the determination as to which version of the events to accept are matters for the jury." Weyant v. Okst, 101 F.3d 845, 855 (2d Cir. 1996).

Where there is a "sharp dispute" as to the nature of the plaintiff's conduct, summary judgment is inappropriate as to a claim of false arrest. Id.

The Third Circuit United States Court of Appeals has recently held, in a police retaliation case, that "[U]nder the First Amendment's right of access to information the public has the commensurate right to record—photograph, film, or audio record—police officers conducting official police activity in public areas." Fields v. City of Phila., 2017 WL 2884391, at *5 (3d Cir. July 7, 2017). The issue in such cases "is not about whether Plaintiffs expressed themselves through conduct. It is whether they have a First Amendment right of access to information about how our public servants operate in public." Id. at *1.

"[A] citizen's right to film government officials, including law enforcement officers, in the discharge of their duties in a public space [ha]s [been] a basic, vital, and well-established liberty safeguarded by the First Amendment [as of 2007]." Glik v. Cunniffe, 655 F.3d 78, 85 (1st Cir. 2011).

## III.   Analysis

### (1) Plaintiff's False Arrest Claim Against Defendants Iocco and Anger Is for the Jury to Decide

Defendants argue in their motion that Plaintiff's false arrest claim against Captain Iocco must be dismissed because Captain Iocco had probable cause to arrest Plaintiff for trespass and disorderly conduct. (Defs.' Br. at 3-4.) Defendants contend that security personnel at 4 New York Plaza "informed [NYPD] officers that they wanted all protesters off the property," and that "officers observed security personnel standing outside the building . . . telling people to leave the property." (Id. at 6.) Defendants rely upon Captain Iocco's deposition testimony, dated April 13,

2016; video recordings of the demonstration at or about the time Plaintiff was arrested; a declaration, dated January 25, 2017, from Michael Clarke, the property manager of 4 New York Plaza; and the deposition, dated September 20, 2012, of James Klein, who was the Security Director at 4 New York Plaza. Defendants also argue that, "[t]o the extent the Court finds probable cause was lacking for [P]laintiff's arrest," Captain Iocco is entitled to qualified immunity because "it was objectively reasonable for [him] to believe that probable cause existed" (id. at 14), and that Chief Anger "was not involved in plaintiff's arrest and there is no indication that he had any interaction with the plaintiff at all" (id. at 12).

Plaintiff responds that his arrest was without probable cause, i.e. "without any basis to believe [Plaintiff] committed a crime." (Pl.'s Br. at 19.) He contends that "no one ever gave [Plaintiff] a warning or instruction to vacate the area outside the building at [4 New York Plaza]" where he was located. (Id. at 13 (internal quotation marks omitted).) Plaintiff also contends that he "stood lawfully outside 4 New York Plaza . . . photographing demonstrations," and that he "was not trespassing and he was not disorderly." (Id. at 1, 23 (citation omitted).) Plaintiff relies upon, among other things, his own deposition testimony, dated May 4, 2016; the same video recordings submitted by Defendants; and non-party witness declarations from Christopher Brown (dated February 16, 2017), Carolyn Morrisroe (dated February 16, 2017), Brendan Burke (dated February 28, 2017), Timothy Fitzgerald (dated February 28, 2017), and Kimlee Davis (dated February 28, 2017), all of whom state that they "never heard anybody from the New York City Police Department or security personnel from 4 New York Plaza tell demonstrators outside the building to leave or to vacate the property." (Korenbaum Decl., filed Mar. 3, 2017, Ex. 5 at 6, 8, 10.) Plaintiff also argues that a "jury can reasonably conclude that [Chief] Anger . . . caused [Plaintiff's] arrest" because, among other things, Captain Iocco testified, on April 13, 2016, "that

4

[Chief] Anger directed him to start making arrests of demonstrators" (Pl.'s Br. at 18), including those who were "[b]locking people from getting in and out of the building" (Korenbaum Decl., Ex. 8 at 40:23-24).

There are genuine (disputed) issues of material fact as to whether there was probable cause to arrest Plaintiff, including issues relating to where Plaintiff was located and what he was doing; and whether Plaintiff was ever ordered to leave the plaza of 4 New York Plaza.[3] See Weyant v. Okst, 101 F.3d 845, 855 (2d Cir. 1996); Yorzinski v. City of N.Y., 175 F. Supp. 3d 69, 78 (S.D.N.Y. 2016). There is also a disputed issue of fact whether Captain Iocco reasonably believed Plaintiff had done anything unlawful. See Weyant, 101 F.3d at 855; Yorzinski, 175 F. Supp. 3d at 78.

New York City zoning regulations state that privately owned public spaces "shall be accessible to the public at all times." N.Y.C. Zoning Resolution § 37-727 (plazas); id. § 37-80 (arcades). Under New York trespass law, "A person who . . . enters or remains in or upon premises which are at the time open to the public does so with license and privilege unless he defies a lawful order not to enter or remain, personally communicated to him by the owner of such premises or other authorized person." N.Y. Penal L. § 140.00(5). As noted, Defendants

---

[3] The following exchange occurred at oral argument on July 13, 2017:

> **The Court:** So I read the papers as being, I wouldn't say all over the place, but disputing the fact of where he was. That is to say was he in the building. Some people actually said he was in the building.
> **Plaintiff's Counsel:** The person who arrested him said he was in the building.
> **The Court:** And others such as yourself said he was outside the building. So there was clearly a dispute about where he was. And by the way, from the way I read the papers, there's a dispute about what he was doing. You know, was he acting disorderly? Was he taking photographs?

(H'rg Tr., dated July 13, 2017, at 5:9-20.)

5

have conceded that the plaza and arcade at 4 New York Plaza were privately owned public space. (See supra p.1; see also Joint Letter from parties to Magistrate Judge Freeman at 1.)

There is evidence that Plaintiff was ordered to leave the premises. Captain Iocco signed a criminal complaint, dated September 18, 2012, stating that he "observed [Gershkovich] yelling and screaming in [a] loud voice[] **inside** of the lobby"; that James Klein, Security Director for 4 New York Plaza, "state[d] in substance to [Gershkovich] multiple times in a loud voice within a close distance of [Gershkovich]: 'YOU MUST LEAVE THE BUILDING OR YOU'LL BE ARRESTED FOR TRESPASSING'"; and that Plaintiff "refuse[d] to leave the building and **continue[d] to stand inside of it**." (Anakhu Decl., filed Jan. 26, 2017, Ex. O ("Crim. Compl.") at 1-2 (emphasis added).) Captain Iocco also testified at his deposition, on April 13, 2016, "I remember security outside of the building[] . . . trying to tell people to leave the property . . . I just saw them working outside trying to get the people who were blocking all the doorways to leave so they could keep the doorways free. . . . They were asking people to leave th[e] whole plaza." (Iocco Dep. at 382:9-20.)

At the same time, there is also evidence that Plaintiff was outside of the building and never was given an order to leave the premises outside the lobby where Plaintiff contends he was, and that he was not disorderly. On May 4, 2016, Plaintiff was asked, "On that day [September 17, 2012], did Captain Iocco or any other police officer tell you that you had to leave the area?" (Gershkovich Dep., dated May 4, 2016, at 60:21-22.) Gershkovich responded, "No, not at any time." (Id. at 60:23.)[4] And, at his deposition on April 13, 2016, Captain Iocco was

_____

[4] The following exchange occurred at oral argument on July 13, 2017:

> **The Court:** [T]here's confusion between what [4 New York Plaza security guards] said to people inside and what they said to people outside. I want to know what did they say to Mr. Gers[h]kovich and who said it?

6

asked, "Did you observe [Plaintiff] standing inside the lobby yelling and screaming in a loud voice?" (Iocco Dep. at 399:15-17.) He answered, "I don't recall if I did." (Id. at 399:18.) Captain Iocco was also asked, "did you observe Jim Klein while standing with[in] a close distance to [Plaintiff] state in sum and substance multiple times in a loud voice, you must leave the building or you'll be arrested for trespassing?" (Id. at 400:6-11.) Again, he answered, "I don't recall now if I did." (Id. at 400:12.) Captain Iocco was also asked, "did you observe [Plaintiff] remain inside the lobby of 4 New York Plaza after being told to leave?" (Id. at 401:10-12.) He answered, "I don't recall." (Id. at 401:13.)

As noted, non-parties, Christopher Brown, Carolyn Morrisroe, Brendan Burke, Timothy Fitzgerald, and Kimlee Davis, all appear to support Plaintiff's version of events on September 17, 2012. Messrs. Burke and Fitzgerald and Ms. Davis state that they "never saw [Plaintiff] inside the building." (Korenbaum Decl., Ex. 5 at 6, 8, 10.)[5] Messrs. Brown, Burke, and Fitzgerald, and Mmes. Morrisroe and Davis state that they "never heard anybody from the New York City Police Department or security personnel from 4 New York Plaza tell demonstrators

---

**Defendants' Counsel:** Your Honor, I'm not certain whether they specifically told Mr. Gers[h]kovich that he could not be there but the fact remains that he could not be there even if he wasn't told that he could not be there.

(H'rg Tr., dated July 13, 2017, at 15:14-21.)

[5] The following exchange occurred at oral argument on July 13, 2017:

**The Court:** So those people who say they saw him inside are they telling you a lie? Is that not true? You have evidence that you submitted that people say he was inside the building and acting disorderly. So that's not true?
**Defendants' Counsel:** I don't know, your Honor, if it's not true or not.

(H'rg Tr., dated July 13, 2017, at 17:17-22.)

outside the building to leave or to vacate the property." (Id. at 2, 5, 7, 9, 11.)[6] Mr. Burke and Ms.

Morrisroe and Davis state that they observed "Mr. Gershkovich taking photographs" and "did

not see [him] block any of the doors leading in and out of 4 New York Plaza." (Id. at 4, 6.) Ms.

Davis and Mr. Fitzgerald also state that "at no time did [they] see Mr. Gershkovich block any of

the entrances to 4 New York Plaza." (Id. at 8, 11.)[7]

There is a "sharp dispute" as to where Plaintiff was standing, the nature of Plaintiff's

conduct, and whether there was probable cause to arrest Plaintiff for trespass and/or disorderly

conduct. See Weyant, 101 F.3d at 855 (where the plaintiff was arrested for disorderly conduct

and "denied using any obscenities" but where the arresting officers "gave evidence to the

contrary"); see also Yorzinski, 175 F. Supp. 3d at 78 ("Defendants have not established that [the

plaintiff's] removal from Yankee Stadium constituted a lawful order to leave all Yankees-owned

property, including the sidewalk where he was ultimately arrested, such that [the arresting

officer] had probable cause to arrest him for criminal trespass."). Sharp disputes extend to

---

[6] The Court has reviewed the video evidence of the demonstration(s) at 4 New York Plaza and
Plaintiff's arrest (Anakhu Decl., filed Jan. 26, 2017, Exs. H-K), which does not obviously appear
to show police or security guards ordering people in the plaza area to leave the premises before
Plaintiff was arrested. (See H'rg Tr., dated July 13, 2017, at 9:19-22 (Plaintiff's Counsel: "He is
outside the building and he is in handcuffs or about to be in handcuffs. You haven't heard an
order to disperse and you won't. But what you'll hear after the fact is . . . "back up.").) Nor did
the video evidence appear to show that Plaintiff was standing in the lobby of 4 New York Plaza.

[7] The following exchange occurred at oral argument on July 13, 2017:

> **Defendants' Counsel:** I believe that [Defendants] said they arrested [Plaintiff] for
> disorderly conduct because he was blocking pedestrian traffic.
> **The Court:** I didn't see that in the video. What was he blocking?
> **Defendants' Counsel:** As your Honor might have seen, he was blocking the doors.
> **The Court:** I didn't see him blocking the doors. If you could play that again and
> show me how he was blocking the doors. I didn't see that at all. I just saw him
> getting arrested. Looked like everybody else was inside the building.

(H'rg Tr., dated July 13, 2017, at 13:18-14:3.)

whether Captain Iocco had probable cause—or a reasonable belief that he had probable cause—to arrest Plaintiff. See Weyant, 101 F.3d at 855; Yorzinski, 175 F. Supp. 3d at 78.

There is also a disputed issue of fact as to whether Chief Anger was personally involved in Plaintiff's arrest, i.e. whether he ordered Captain Iocco to arrest Plaintiff. See Arbuckle v. City of N.Y., 2016 WL 5793741, at *13 (S.D.N.Y. Sept. 30, 2016); Case v. City of N.Y., 2017 WL 571530, at *16 (S.D.N.Y. Feb. 10, 2017). "[I]t is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." Farid v. Ellen, 593 F.3d 233, 249 (2d Cir. 2010) (citations omitted). "[C]onduct such as ordering that an arrest be made . . . can suffice to demonstrate direct participation." Arbuckle, 2016 WL 5793741, at *13. Captain Iocco was asked at his deposition on April 13, 2016, "Was it Chief Anger who instructed you to start making arrests?" (Iocco Dep. at 367:3-4.) Captain Iocco answered, "Yes." (Id. at 367:5.) A reasonable jury could find that Chief Anger was personally involved if he "made the determination to engage in . . . mass arrests" and "ordered, directed, and/or otherwise supervised the mass detention and arrests," including Plaintiff's arrest. See Case, 2017 WL 571530, at *16.

### (2) Plaintiff's Claim for Deprivation of the Right to a Fair Trial Against Defendant Iocco Is for the Jury to Decide

Defendants argue that: **(i)** Iocco, a NYPD Captain, did not fabricate evidence in the complaint against Plaintiff that he filed because, among other things, the "arrest was based on information that was relayed to [him] . . . by a complaining victim" (Defs.' Br. at 17); **(ii)** any misrepresentation by Captain Iocco was "immaterial" (id. at 18) and "would [not] likely influence a jury's decision," Marom v. City of N.Y., 2016 WL 5900217, at *3 (S.D.N.Y. July 29, 2016); and **(iii)** "there is no evidence to suggest that plaintiff suffered a deprivation of his liberty" because his being "required to attend a few court appearances . . . is not enough" (id.).

9

Plaintiff claims that Captain Iocco "suppl[ied] false information to the DA's Office," which led to the deprivation of Plaintiff's liberty and is the basis for his claim of deprivation of the right to a fair trial. (Pl.'s Br. at 16.) Such a claim arises when "an (1) investigating official (2) fabricates evidence (3) that is likely to influence a jury's decision, (4) forwards that information to prosecutors, and (5) the plaintiff suffers a deprivation of liberty as a result." Garnett v. Undercover Officer C0039, 838 F.3d 265, 277 (2d Cir. 2016). Plaintiff alleges that Captain Iocco fabricated evidence by signing the criminal complaint, dated September 18, 2012, in which he falsely stated that he "observed [Gershkovich] yelling and screaming in [a] loud voice[] inside of the lobby" and that he also "observed [Gershkovich] refuse to leave the building and continue to stand inside of it." (Crim. Compl. at 1-2.) As noted supra pp. 6-8, there is ample contrary evidence that Plaintiff was not in the lobby of 4 New York Plaza and was not disorderly. This evidence includes Plaintiff's own testimony, as well as declarations from nonparties, Burke, Fitzgerald, and Davis, that they "never saw [Plaintiff] inside the building." (Korenbaum Decl., Ex. 5 at 6, 8, 10.) And, as stated above, Captain Iocco said at his deposition, on April 13, 2016, that he could not recall whether he "observe[d] [Plaintiff] standing inside the lobby yelling and screaming in a loud voice." (Iocco Dep. at 399:15-17.)

There are disputed material issues of fact as to whether Plaintiff was deprived of a fair trial. See Garnett v. Undercover Officer C0039, 838 F.3d 265, 277 (2d Cir. 2016); Shabazz v. Kailer, 201 F. Supp. 3d 386, 396 (S.D.N.Y. 2016); Bryant v. Serebrenik, 2016 WL 6426372, at *7 (E.D.N.Y. Oct. 28, 2016). Captain Iocco's contention that his statements in the criminal complaint were "based on information that was relayed to [him] . . . by a complaining victim" (Defs.' Br. at 17) appears to be contradicted by his statements that he (himself) "**observed** [Plaintiff] yelling and screaming in [a] loud voice[] inside of the lobby," and that he (himself)

10

"**observed** the [Plaintiff] refuse to leave the building and continue to stand inside of it." (Crim. Compl. at 1-2 (emphases added).) See Garnett, 838 F.3d at 274 (where "the information fabricated [wa]s the officer's own account of his or her observations of alleged criminal activity").

Captain Iocco swore in the criminal complaint that 4 New York Plaza's Security Director, James Klein, "state[d] in substance to [Gershkovich] multiple times in a loud voice within a close distance of [Gershkovich]: 'YOU MUST LEAVE THE BUILDING OR YOU'LL BE ARRESTED FOR TRESPASSING,'" and that Plaintiff "refuse[d] to leave the building and continue[d] to stand inside of it." (Crim. Compl. at 1-2.) These statements "likely [would] have influenced [a] jury's decision" whether Plaintiff was trespassing or disorderly. See Shabazz, 201 F. Supp. 3d at 396.

Plaintiff contends that Captain Iocco forwarded the allegedly false criminal complaint to the prosecutor, and that Plaintiff was arrested and detained (in custody) for 36 hours and thereafter required to appear in court. (See Korenbaum Decl., Exs. 1, 17-18.) Plaintiff's contentions are sufficient to raise an issue of fact whether Plaintiff suffered a deprivation of liberty. See Bryant, 2016 WL 6426372, at *7 (where one plaintiff was incarcerated for 18 hours, and the other for 21 hours); Apostol v. City of N.Y., 2014 WL 1271201, at *5 (E.D.N.Y. Mar. 26, 2014) (where one plaintiff was incarcerated for 19 hours, and the other for 21 hours), aff'd, 607 F. App'x 105 (2d Cir. 2015); Dowling v. City of N.Y., 2013 WL 5502867, at *7 (E.D.N.Y. Sept. 30, 2013) ("Plaintiff's twenty-four hours in jail, culminating . . . in adjournment in contemplation of dismissal, . . . warrant[s] a finding that he was deprived of his liberty.").

**(3) Defendants' Qualified Immunity Defense to Plaintiff's Claim of Retaliation Need Not Be Decided at this Time**

Defendants argue that Plaintiff's First Amendment retaliation claim, i.e. Plaintiff's claim that he was arrested because he was photographing the police response to the Occupy Wall Street demonstration, must be dismissed because: **(i)** "Plaintiff has failed to explain how his conduct could be considered expressive" (Defs.' Br. at 10)**; (ii)** "Plaintiff cannot provide evidence to show that the actions of the officers were motivated or substantially caused by any First Amendment expression" (id. at 12)**; and (iii)** "[c]ourts have found that the right to record police activities is not clearly established therefore the actions of the officers would be shielded" (id. at 11).

Plaintiff counters that: **(i)** his conduct was expressive because he "video recorded and took photographs of the [New York Police] Department's interaction with the [Occupy Wall Street] demonstrators . . . so that he could disseminate it to the public at large for their consumption" (Pl.'s Br. at 13-14)**; (ii)** "the jury can reasonabl[y] conclude that it was . . . [Plaintiff's photographic] expressive activity that caused Iocco to arrest him." (Id. at 15.)[8]**; and (iii)** "the law was clearly established that the public has the right to film police interactions with the citizenry" (id. at 14). "[E]very Circuit to address the issue has held that such a right exists

---

[8] Plaintiff contends that Captain Iocco "asked [Plaintiff] if he had a press pass" before arresting Plaintiff. (Pl.'s Br. at 15.)

under the First Amendment." (Id. (citing Higginbotham v. City of New York, 105 F. Supp. 3d 369 (S.D.N.Y. 2015)).)[9, 10]

Plaintiff also emphasizes that New York City's own Rule 30(b)(6) witness in this case, Dameion Cox, a sergeant at the NYPD Police Academy, was asked at his deposition, on June 23, 2016, **whether "everybody who has become a member of the service for the NYPD since the '70s has been trained that civilians have the right to film the police," and that Cox answered, "Yes"** (Cox Dep. at 60:15-20 (emphasis added); see also infra pp. 18-19).

The Court finds that Plaintiff's alleged conduct of taking photographs and videos of the Occupy Wall Street demonstrations for public consumption prior to his arrest on September 17, 2012 ("to show the world what is happening") (Pl.'s 56.1 ¶¶ 84, 87), would likely be considered expressive within the meaning of the First Amendment. See Fields, 2017 WL 2884391, at *3 ("The First Amendment protects actual photos, videos, and recordings, and for this protection to have meaning the Amendment must also protect the act of creating that material." (citation omitted)); Turner v. Lieutenant Driver, 848 F.3d 678, 689 (5th Cir. 2017) ("[T]he First Amendment protects the act of making film, as there is no fixed First Amendment line between the act of creating speech and the speech itself."); Davis v. Stratton, 575 F. Supp. 2d 410, 421 (N.D.N.Y. 2008) ("[I]t has already been established in the Second Circuit that communicative photography is well-protected by the First Amendment."), rev'd on other grounds, 360 F. App'x 182 (2d Cir. 2010); Porat v. Lincoln Towers Cmty. Ass'n, 2005 WL 646093, at *5 (S.D.N.Y.

---

[9] The parties acknowledge that the U.S. Court of Appeals for the Second Circuit "has yet to weigh in on this issue," i.e. whether the public has the right to film police interactions with the citizenry. (Pl.'s Br. at 14; see also Defs.' Br. at 11.)

[10] Defendants' argument that Plaintiff has failed to state a First Amendment retaliation claim against Chief Anger (Id. at 9 n.2) is not conclusive because there is disputed evidence as to whether Chief Anger had personal involvement in Plaintiff's arrest. See supra p. 9.

Mar. 21, 2005), aff'd, 464 F.3d 274 (2d Cir. 2006); Krukowski v. Swords, 15 F. Supp. 2d 188,

195 (D. Conn. 1998) ("Photography[] . . . [is] plainly expressive activit[y] that ordinarily

qualif[ies] for First Amendment protection.").

      The Court also finds that there is an issue of fact for the jury as to Captain Iocco's

motivation for arresting Plaintiff, e.g. Was his motive Plaintiff's alleged trespassing, or

Plaintiff's alleged disorderly conduct, or did Captain Iocco's motive relate to Plaintiff's

photographing the demonstrators and/or the arrests being made at 4 New York Plaza? See

Anderson v. City of N.Y., 817 F. Supp. 2d 77, 96-97 (E.D.N.Y. 2011); Funnye v. Paragon

Sporting Goods Co. LLC, 2001 WL 300740, at *9 (S.D.N.Y. Mar. 27, 2001). As in Anderson, it

is unclear in this case "whether probable cause existed for [P]laintiff's arrest or whether, as

alleged by [P]laintiff, the officers arrested him with improper motives. Accordingly, a genuine

issue of material fact precludes summary judgment on the element of intent." Anderson, 817 F.

Supp. 2d at 97; see also Sheppard v. Beerman, 94 F.3d 823, 829 (2d Cir. 1996) (where a plaintiff

alleging First Amendment retaliation "present[s] particularized (direct or circumstantial)

evidence of unconstitutional motive"); Locurto v. Safir, 264 F.3d 154, 170 (2d Cir. 2001) ("[A]

plaintiff need only show particularized evidence of direct or circumstantial facts supporting his

claim of unconstitutional motive in order to survive a motion for summary judgment" (internal

quotation marks omitted)); Funnye, 2001 WL 300740, at *9 (where the plaintiff alleged "that

[officers] arrested him in retaliation for the plaintiff's recording of their names and badge

numbers").

### Qualified Immunity

      As to Defendants' remaining defense to Plaintiff's retaliation claim, the Court finds that it

is premature to decide at this time whether Defendants are entitled to qualified immunity. To be

clear, the Court is not here ruling whether or not qualified immunity is a defense to Plaintiff's

retaliation claim. While the Court recognizes that the qualified immunity issue should be

resolved relatively early in the proceedings, material issues of fact presented here (related to

probable cause to arrest) must first be resolved by the jury.[11] Stephenson v. Doe, 332 F.3d 68, 80

(2d Cir. 2003). That is, whether or not Defendants are entitled to qualified immunity against

Plaintiff's retaliation claim is contingent upon how the jury resolves the issues of where Plaintiff

was standing, what he was doing (e.g. being disorderly or photographing the demonstration), and

whether he had been asked to leave the premises. The threshold (or preliminary) question is

whether Captain Iocco had probable cause to arrest Plaintiff. If the jury were, for example, to

decide that Defendants had probable cause to arrest Plaintiff, Plaintiff's retaliation claim would,

as noted at footnote 11, likely become moot for the reason that "the existence of probable cause

is a complete defense to a claim of retaliatory arrest." See Golodner, 443 F. App'x at 624. If the

---

[11] Counsel for the Defendants appeared to agree with this approach at oral argument on July 13, 2017:

> **Defendants' Counsel:** [Y]our Honor, I believe that the arrest here was not a retaliatory arrest. There was probable cause.
> **The Court:** So if that were the case, you don't need to get there [i.e. to the issue of qualified immunity], right?
> **Defendants' Counsel:** That is correct, your Honor.
> **The Court:** You are saying we don't need to reach qualified immunity because there was probable cause?
> **Defendants' Counsel:** Yes.
> **The Court:** And the case law holds that probable cause vitiates a claim of retaliatory arrest.
> **Defendants' Counsel:** That is correct, your Honor.
> **The Court:** So I do agree with you wholeheartedly on that.
> **Defendants' Counsel:** Thank you, your Honor.

(H'rg. Tr., dated July 13, 2017, at 27:5-19.) The Court intends to resolve the qualified immunity issue soon after the jury has determined whether or not the Defendants had probable cause to arrest the Plaintiff. See Golodner v. City of New London, 443 F. App'x 622, 624 (2d Cir. 2011) ("[T]he existence of probable cause is a complete defense to a claim of retaliatory arrest.").

jury were to decide that Defendants did not have probable cause to arrest Plaintiff, it would then be appropriate further to examine Plaintiff's First Amendment claim, including the issue of Defendants' qualified immunity. See id.

### Qualified Immunity Decisions

Assuming it were appropriate for the Court to decide the qualified immunity issue at this point (which it is not), the Court would likely conclude, first, that "under the First Amendment's right of access to information the public has the commensurate right to record—photograph, film, or audio record—police officers conducting official police activity in public areas" and, second, that Captain Iocco and Chief Anger did **not** have immunity to arrest Plaintiff for exercising that right because the right was "clearly established." Fields, 2017 WL 2884391, at *5. The First, Third, Fifth, Seventh, Ninth, and Eleventh Circuits have found that the First Amendment protects the right to record police activity. See Turner v. Lieutenant Driver, 848 F.3d 678, 688 (5th Cir. 2017); ACLU of Ill. v. Alvarez, 679 F.3d 583, 608 (7th Cir. 2012); Glik v. Cunniffe, 655 F.3d 78, 82, 85 (1st Cir. 2011); Smith v. City of Cumming, 212 F.3d 1332, 1333 (11th Cir. 2000); Fordyce v. City of Seattle, 55 F.3d 436, 439 (9th Cir. 1995); see also Floyd v. City of N.Y., 959 F. Supp. 2d 668, 685 (S.D.N.Y. 2013). See generally Jocelyn Simonson, Beyond Body Cameras: Defending A Robust Right to Record the Police, 104 Geo. L.J. 1559, 1561-62 (2016) ("**[I]t is more likely than not that we are heading toward a national recognition of a First Amendment right to record on-duty police officers in public.**" (emphasis added)).

In analyzing the issue of qualified immunity, the Court would point out that not all of the Circuits have found that the constitutional right to photograph police activity was "clearly established" at the time of their decisions. Compare Glik, 655 F.3d at 85 ("[T]he right violated

16

by [police officers] was clearly established in this circuit at the time of [the plaintiff's] arrest [on October 1, 2007].")), with Fields, 2017 WL 2884391, at *6 ("[O]ur case law does not clearly establish a right to videotape police officers performing their duties [in 2012 and 2013].")), and Turner, 848 F.3d at 687 ("Although the right was not clearly established at the time [i.e. September 2015]," "the right is clearly established henceforth.").[12]

### Clearly Established or Foreshadowed

Qualified immunity, as noted, depends upon "whether the right plaintiff asserts is so clearly established [or foreshadowed] that defendants should have known it." Charles W. v. Maul, 214 F.3d 350, 353 (2d Cir. 2000). And, while the Second Circuit Court of Appeals has not

---

[12] One Southern District of New York District Judge has recently acknowledged the constitutional right to photograph police activity and also found that this right was clearly established:

> If one accepts that photographing and filming receive First Amendment protection as a general matter . . . , it is difficult to see why that protection should disappear simply because their subject is public police activity. "The First Amendment goes beyond protection of the press and the self-expression of individuals to prohibit government from limiting the stock of information from which members of the public may draw." First Nat'l Bank of Boston v. Bellotti, 435 U.S. 765, 783 (1978).

Higginbotham, 105 F. Supp. 3d at 379 (brackets, ellipsis, citations, and internal quotation marks omitted); see also ACLU, 679 F.3d at 597 ("There is practically universal agreement that a major purpose of the First Amendment was to protect the free discussion of governmental affairs." (brackets and ellipsis omitted) (quoting Arizona Free Enter. Club's Freedom Club PAC v. Bennett, 564 U.S. 721, 753 (2011))); Glik, 655 F.3d at 82 ("Gathering information about government officials in a form that can readily be disseminated to others serves a cardinal First Amendment interest in protecting and promoting the free discussion of governmental affairs." (internal quotation marks omitted)); Smith, 212 F.3d at 1333 ("The First Amendment protects the right to gather information about what public officials do on public property, and specifically, a right to record matters of public interest."). "[T]he proliferation of bystander videos has spurred action at all levels of government to address police misconduct and to protect civil rights." Fields, 2017 WL 2884391, at *5 (internal quotation marks omitted). But see Soto v. City of N.Y., 2017 WL 892338, at *5 (S.D.N.Y. Mar. 6, 2017) (Swain, J.); Gonzalez v. City of N.Y., 2015 WL 6873451, at *7 (S.D.N.Y. Nov. 9, 2015) (Schofield, J.); Pluma, 2015 WL 1623828, at *7 (Preska, J.); Mesa v. City of N.Y., 2013 WL 31002, at *25 (S.D.N.Y. Jan. 3, 2013) (Oetken, J.), which hold that the right to record police activity was not clearly established.

spoken definitively on this subject, the "[d]ecisions of other circuits also may indicate whether the law was clearly established" by "clearly foreshadow[ing] a particular ruling on the issue." See Varrone, 123 F.3d at 79 (internal quotation marks omitted) (where the court found that a "'reasonable suspicion' standard for strip searches of prison visitors" had been "clearly foreshadow[ed]"); see also Terebesi, 764 F.3d at 231. If this Court were resolving the issue of qualified immunity, the Court would likely conclude that decisions from other Circuits clearly foreshadowed a finding here that "the First Amendment right to film was . . . clearly established at the time of the arrest." See Glik, 655 F.3d at 85.

Plaintiff's alleged conduct in this case was very similar to that of the plaintiffs in Glik, Smith, and Fordyce, and those decisions, in this Court's view, clearly foreshadow a ruling here that citizens have a right to film police activity and that police officers are not entitled to qualified immunity if they retaliate against a citizen who exercises that right. See Glik, 655 F.3d at 79-80 (where the plaintiff was arrested after he "caught sight of three police officers . . . arresting a young man, . . . . stopped roughly ten feet away and began recording video footage of the arrest on his cell phone"); Smith, 212 F.3d at 1332 (where police harassed plaintiff and prevented him from filming their conduct); Fordyce, 55 F.3d at 438 (where the plaintiff was "videotap[ing] a public protest march," including "the activities of the police officers assigned to work the event"); see also Higginbotham, 105 F. Supp. 3d at 379 (where the plaintiff had been "videotaping . . . police officers in the performance of the duties in public"); Floyd, 959 F. Supp. 2d at 685 (where the court "order[ed] the NYPD to institute a pilot project in which body-worn cameras will be worn for a one-year period by officers on patrol in one precinct per borough").

Tellingly, perhaps, the NYPD has trained its officers since the 1970s to understand that citizens may record (photograph) police activity. See NYPD Academy Sergeant Cox. Dep. at

18

60:7-23 ("Q. Do civilians have the right to film the police? A. Yes. Q. And I believe you said

that the NYPD has been training its members at the Academy of these rights since the '70s?

A. Yes. Q. And that everybody who has become a member of the service for the NYPD since the

'70s has been trained that civilians have the right to film the police? A. Yes. Q. Where does that

right come from? A. First Amendment.")[13]; see also Fields, 2017 WL 2884391, at *2 (where the

Philadelphia police department "published a memorandum advising officers not to interfere with

a private citizen's recording of police activity because it was protected by the First

Amendment").

### (4) Plaintiff's Monell Claim Is for the Jury to Decide

Defendants argue that Plaintiff's municipal liability claim must be dismissed because:

(i) Plaintiff has not shown that "the City was on notice of a need for . . . [police] training" on

policing protests since Plaintiff "asserts—without evidentiary support—that over 2600 [Occupy

Wall Street] protestors were arrested" and that "those arrests . . . resulted in some form of

dismissal." (Defs.' Br. at 20, 23.) Defendants also state that "criminal charges may be dismissed

---

[13] The following exchange occurred at oral argument on July 13, 2017:

> **The Court:** OK. I found this discussion about how police have been trained since
> the 70s to be interesting at the very least. So one of your [Defendants' Counsel's]
> clients was asked: Do civilians have the right to film the police? And he answered
> "yes." Then he is asked: And I believe you said that the NYPD has been training
> its members at the academy of these rights since the 70s. And he answered "yes."
> And the next question was: And that everybody who has become a member of the
> service for the NYPD since the 70s has been trained that civilians have the right to
> film the police. Answer: Yes. And question: Where does that right come from?
> Answer: First amendment. I forget[;] who was that[?]
> **Plaintiff's Counsel:** That was the [C]ity of New York. . . . Dam[eio]n Cox, a
> sergeant at the police academy.
> **The Court:** Pretty sophisticated conversation with the sergeant. So he thought the
> right had been clearly established.

(H'rg Tr., dated July 13, 2017, at 5:9-20.)

for any number of reasons." (<u>id.</u> at 21)**;** and **(ii)** Plaintiff has not shown that a failure to train police "caused plaintiff's alleged injuries" (<u>id.</u> at 23).

Plaintiff responds that: **(i)** "[t]he Department has been on notice that its members needed training in sidewalk protest policing since as early as 2002" because, among other reasons, the City has always been a "hive" of political demonstrations (Pl.'s Br. at 21) which create an "obvious need for some form of training" (<u>id.</u> at 24 (quoting <u>Connick v. Thompson</u>, 563 U.S. 51, 68-70 (2011)))**;** and **(ii)** "the City did not provide any training outside the Academy about the Constitution[] [or] about the rights of protestors" (<u>id.</u> at 22).

There is a material issue of (disputed) fact whether the City was on notice of the need for (additional) training about policing protests and demonstrations. <u>See</u> <u>Case v. City of N.Y.</u>, 2017 WL 571530, at *23 (S.D.N.Y. Feb. 10, 2017). Some courts have cited to a number of cases presumably "spanning the period from 2000 to 2012 that [allegedly] demonstrate a pattern and practice of constitutional abuse involving the use of mass arrest policies." <u>Case</u>, 2017 WL 571530, at *23. A demonstrable pattern of such abuses, **if any exists**, might "permit a plausible inference of deliberate indifference" and the need for better training on policing protests. <u>Id.</u> at *24.

There is also a material issue of disputed fact as to whether the City's alleged failure to train caused Plaintiff's constitutional injury. Defendants argue that Plaintiff has not shown that a failure to train police "caused plaintiff's alleged injuries." (Defs.' Br. at 23.) According to the Plaintiff, the City caused injury to Plaintiff (<u>i.e.</u> remand and detention) because it did not provide any training outside the Academy about the Constitution or about the rights of protestors. (Pl.'s 56.1 ¶ 119; <u>see also</u> Korenbaum Decl., Ex. 7 at 74-80, 89-91, 105-09; <u>id.</u>, Ex. 8 at 90-97; <u>id.</u>, Ex. 13 at 33, 63-64; <u>id.</u>, Ex. 14 at 140-43; <u>Okin v. Vill. of Cornwall-On-Hudson Police Dep't</u>, 577

F.3d 415, 441 (2d Cir. 2009) ("Because some of the officers were unable during their depositions to remember basic details regarding their training . . . , a reasonable factfinder could plausibly infer that the training program failed to impart . . . the necessary frequency or specificity how to appropriately respond . . . .").) "In the absence of training, there is no way for novice officers to obtain the legal knowledge they require." Connick, 563 U.S. at 63-64. The Court is not here finding that NYPD training was insufficient but concludes that the alleged failure to train officers about the First Amendment rights of protesters could have the "obvious consequence" of violation of those rights and ensuing injury. See id. at 61; Waller, 89 F. Supp. 3d at 285; Prevost, 2014 WL 6907560, at *7.

## IV.    Conclusion

For the reasons stated herein above, **Defendants' motion for summary judgment [#139] is denied. Plaintiff's cross-motion for partial summary judgment [#152] is also denied.**

A scheduling/settlement conference with principals is hereby scheduled for Tuesday, July 25, 2017 at 9:00 a.m.

Dated: New York, New York
      July 17, 2017

$RMB$

**RICHARD M. BERMAN**
**U.S.D.J.**